## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RICKY CHRISTIAN,                       :
ALEJANDRO GARCIA VENEGAS,     :
LESLIE RICHARDSON,             :
JOSE ALBERTO ALEMAN LOPEZ, and   :
JOSE SANTIAGO GUTAMA CRIOLLO, *for* :
*themselves and all similarly situated individuals*, :
                                  :
               Plaintiffs,    :    Civil Action No. 2:22-2253 (MSG)
                                  :
v.                                 :
                                  :
TRANS UNION, LLC,             :
                                  :
               Defendant.    :
_____:

## FIRST AMENDED COMPLAINT

Plaintiffs Ricky Christian, Alejandro Garcia Venegas, Leslie Richardson, Jose Alberto Aleman Lopez, and Jose Santiago Gutama Criollo, by counsel, for themselves and all similarly situated individuals, bring the following Class Action Complaint against Defendant Trans Union, LLC ("TransUnion"). For their Complaint, they allege as follows:

### INTRODUCTION

1.    When enacting the Fair Credit Reporting Act ("FCRA"), Congress found that consumer reporting agencies "have assumed a vital role in assembling and evaluating . . . information on consumers." 15 U.S.C. § 1681(a)(3). Thus, Congress saw a need to ensure that consumer reporting agencies "exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." *Id.* § 1681(a)(4). To accomplish Congress' goal, the FCRA contains several requirements to protect consumers, including § 1681e(b), which is one of the statute's cornerstone provisions.

2.      Section 1681e(b) requires that consumer reporting agencies follow reasonable procedures to assure maximum possible accuracy of the information on the individuals about whom they report.  15 U.S.C. § 1681e(b).  This section imposes a high standard on consumer reporting agencies.  *See, e.g.*, *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011) (breaking down the requirements of § 1681e(b) and explaining that "'assure' means 'to make sure or certain: put beyond all doubt,'" "'[m]aximum' means the 'greatest in quantity or highest degree attainable[,]' and 'possible' means something 'falling within the bounds of what may be done, occur or be conceived'" (quoting *Webster's Third New International Dictionary* 133, 1396, 1771 (1993))).

3.      Trans Union violated § 1681e(b) by issuing reports indicating that consumers were dead when, in fact, the consumers were alive.

4.      In addition, Trans Union included statements in its reports indicating that consumers' Social Security Numbers had been linked to a claim for Social Security death benefits. Trans Union reported information about consumers to third parties at the same time that it refused to issue credit scores on such consumers, something Trans Union represents it does when a consumer is "deceased."

5.      Trans Union persisted in reporting these purported matches even when the consumer's name and date of birth did not match the name and date of birth of the individual associated with the death benefit claims.  Sometimes, the death benefit claim had been made years before Trans Union's records showed the consumer was even born.  Trans Union even reported this information about consumers who had an Individual Taxpayer Identification Number ("ITIN") rather than a Social Security Number.

6.      Plaintiffs were all falsely marked as deceased in Trans Union's reports to their potential creditors, resulting in "no" credit score and an inability to obtain credit.

7.      Trans Union could have prevented these inaccuracies and resulting harm by requiring a name and date of birth match between the consumer and the person associated with the death benefits claim, or by excluding Social Security Number matches from the reports of consumers who had ITINs.

8.      Trans Union's failure to implement these simple and commonsense safeguards violated the FCRA's mandate that it "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).  Because the putative class members were subject to the same procedures and suffered the same overarching harm, Plaintiffs' § 1681e(b) claims are capable and appropriate for class resolution.

9.      For California consumers, Trans Union's conduct also violated California's Consumer Credit Reporting Agencies Act, which imposes similar obligations to the FCRA on consumer reporting agencies.  *See* Cal. Civ. Code § 1785.14(b).

10.     For New York consumers, Trans Union's conduct also violated New York's Fair Credit Reporting Act, which imposes similar obligations to the FCRA on consumer reporting agencies.  *See* NY Gen. Bus. Law § 380-j(e).

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over Plaintiffs' claims under 15 U.S.C. § 1681p, which allows FCRA claims to be brought in any appropriate court of competent jurisdiction.

12.     The Court has personal jurisdiction over Defendant.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendant resides in this district.

14.     Venue is also proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that form the basis of the lawsuit occurred at 2 Baldwin Place, Chester, PA 19022.

## PARTIES

15.     Each Plaintiff is a natural person and a consumer as defined by 15 U.S.C. § 1681a(c).

16.     Defendant Trans Union, LLC ("Trans Union" or "Defendant") is a limited liability company with a principal place of business located at 2 Baldwin Place, Chester, PA 19022.  Trans Union is authorized to do business in the State of Pennsylvania, including in this county.

17.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f).

## FACTS

### Trans Union Touts its Cutting-Edge Fraud Prevention Report

18.     In the United States, consumer reporting is a highly profitable multi-billion-dollar industry dominated by three agencies: Equifax, Experian, and Trans Union.

19.     Each of these companies' business models depend on assembling as much information on American consumers as possible, then selling that information to their customers—largely banks and finance companies—to use in evaluating consumers' credit applications.

20.     Because each agency receives similar information from many of their sources (creditors and public record depositories), one way that these competitors seek to gain competitive advantages in the market is by collecting as much data as possible and then developing unique, specialized reports to help their customers minimize risk.

4

21.     For example, Trans Union boasts that it has "over 50 petabytes of data, growing at an average rate of approximately 25% per year since 2010 . . . 90,000 data sources, including financial institutions, private databases and public records repositories. We refine, standardize and enhance this data using sophisticated algorithms to create proprietary databases. . . . We believe we are the largest provider of scale in the United States to possess both nationwide consumer credit data and comprehensive, diverse public records data, which allows us to better predict behaviors, assess risk and address a broader set of business issues for our customers." Trans Union, Annual Report (Form 10-K) 1 (Feb. 13, 2018), available at https://investors.transunion.com/~/media/Files/T/Transunion-IR/annual-reports/2017/tru-2017-annual-report.pdf.

22.     Trans Union focuses its data and reports on helping its paying customers: "our data, analytics and decisioning capabilities allow businesses to authenticate the identity of consumers, effectively determine the most relevant products for consumers, retain and cross-sell to existing consumers, identify and acquire new consumers and reduce loss from fraud." *Id.* at 1-2.

23.     Trans Union sells multiple credit reporting products that contain different information.  One product Trans Union has developed is designed to help lenders identify and avoid fraudulent transactions.

24.     Trans Union debuted this product, first called IDVision, in January 2017. https://newsroom.transunion.com/transunion-introduces-idvision-to-help-businesses-prevent--sophisticated-and-evolving-fraud-and-identity-theft/.

25.     According to Trans Union, IDVision "brings together robust data assets with advanced analytics technology that links, interprets and analyzes information to discover anomalies and patterns of risk. Businesses receive actionable alerts and instantly delivered scores

so        they        can        make        timely        decisions."

https%3A%2F%2Fnewsroom.transunion.com%2Ftransunion-introduces-idvision-to-help-

businesses-prevent--sophisticated-and-evolving-fraud-and-identity-theft%2F.

26.    Trans Union marketed IDVision as being a highly accurate predictor of potentially

fraudulent activity.

27.    Recently, it appears that Trans Union has rebranded IDVision into TruValidate.

28.    TruValidate has the same main goal: to help Trans Union's paying customers

prevent fraud-based losses in the lending process.

29.    TruValidate is an important product for Trans Union: Trans Union recently bought

Neustar, a premier identity resolution company, for $3.1 billion, in order to expand and strengthen

its IDVision/TruValidate product.   https://www.acainternational.org/news/transunion-to-acquire-

neustar-for-3-billion/.

*Trans Union's Over-Inclusive Fraud Predictors*

30.    One item included as part of Trans Union's IDVision product (and in other products

sold by Trans Union) is information regarding whether a consumer's Social Security Number has

been used in a death benefits claim from the Social Security Administration.

31.    If accurate, this item would allow Trans Union's customers to avoid transactions in

which fraudsters were attempting to obtain credit using a dead person's Social Security Number.

32.    In actuality, however, Trans Union—perhaps to help boost its marketing numbers

and make it seem like the product identifies more instances of fraud than it actually does—uses

overly loose criteria when adding a death benefits flag to a consumer's file.

33.    Trans Union has repeatedly flagged consumers as potential fraudsters using a

suspect Social Security Number that was the subject of a death benefits claim, even though the

information about the person who was the subject of the death benefits claim does not match the consumer's name, address, or date of birth.

34.     This inaccuracy is clear from the face of the report, yet Trans Union does not employ any reasonable procedures to exclude this inaccurate and misleading information from its consumer reports.

35.     Even worse, once the information about the death benefits claim is added to the consumer's file, Trans Union marks the consumer as deceased and refuses to provide a credit score about the consumer.

36.     This inaccurate and misleading reporting has a devastating impact on a consumer's credit file—once a deceased notation is added, no credit score will be generated for that consumer and the consumer will be unable to obtain credit.

*Trans Union's Inaccurate Reporting Also Impacts Immigrants*

37.     Trans Union's inaccurate reporting is not limited to consumers who have Social Security Numbers.

38.     Instead, consumers who have Individual Tax Identification Numbers ("ITIN") are also impacted by Trans Union's lax matching procedures.

39.     Individuals may have an ITIN at one point in their lives and a Social Security Number at another, but never simultaneously.

40.     ITINs are easily distinguishable from Social Security Numbers.  Like Social Security Numbers, ITINs are nine digits.  Unlike Social Security Numbers, however, all ITINs start with "9" and have a range of numbers from "50" to "65", "70" to "88", "90" to "92" and "94" to "99" for the fourth and fifth digits.  INTERNAL REVENUE SERVICE, PUBLICATION 1915,

UNDERSTANDING YOUR IRS INDIVIDUAL TAXPAYER IDENTIFICATION NUMBER ITIN 5 (2021) (available at https://www.irs.gov/pub/irs-pdf/p1915.pdf).

41.     Trans Union knows when a consumer has an ITIN rather than a Social Security Number.

42.     Despite these obvious differences between ITINs and Social Security Numbers, Trans Union does not have any meaningful procedures in place to prevent it from reporting a Social Security Number death benefits alert about a consumer who has an ITIN.

43.     Again, this has a devastating impact on these consumers, as it results in the consumer being labeled as deceased with "no" credit score.

*Plaintiff Ricky Christian*

44.     Within the last five years, Trans Union has reported to several third parties that Mr. Christian's Social Security Number was used in a death benefits claim, including: Servion, Inc. via Advantage Credit, Inc. on March 9, 2021; Hayes RV Center on April 19, 2021; Safeco Insurance on March 26, 2021 and January 7, 2021; Allstate Insurance on March 26, 2021; National General Insurance on January 7, 2021; and Liberty Mutual on January 7, 2021.

45.     Upon information and belief, Trans Union reported this alert, or a substantially similar alert to those entities:

| TU IDVISION ALERT |
|---|
| *** IDVISION ALERT *** |
| 3 - CHRISTIAN, RICKY |
| * 6000 - FILE SSN USED IN DEATH BENEFITS CLAIM FOR THURMAN GARNER.DOB:08/27/1903.DOC:12/01/1976.ZIP CODE LAST RESIDENCE IS 76471,MOST LIKELY RISING STAR,TX |

46.     This information was incorrect.

47.     Trans Union should also have easily been able to exclude this information from Mr. Christian's report: Mr. Christian has never used the name "Thurman Garner" and he was not born in 1903.

48.     This inaccurate reporting meant that he had no Trans Union credit score:

TRANSUNION/FICO CLASSIC (04) - RICKY L CHRISTIAN SR -████████
SCORE: **N/A**
SC2 - FILE NOT SCORED BECAUSE SUBJECT IS DECEASED

49.     Because of this inaccurate reporting, Mr. Christian suffered actual damages, including a reduced credit score and credit denials.

50.     Then, on April 23, 2021, Mr. Christian called Trans Union to dispute the inaccurate information about the death benefits notation.

51.     In response to Mr. Christian's dispute, Trans Union failed to conduct an adequate investigation and remove the information from Mr. Christian's report.

52.     Mr. Christian continued to check his Trans Union report to see if the inaccurate information had been removed. But on one or more occasions, Trans Union refused to provide Mr. Christian with a copy of his file.

53.     For example, Mr. Christian requested a copy of his file disclosure in December 2021, but Trans Union sent him a letter dated December 29, 2021 stating that it would not provide him with a copy and asked for additional information to verify his identity.

54.     Mr. Christian provided this information, but Trans Union still refused to provide him with a copy of his file.

55.     Instead, Trans Union sent Mr. Christian a letter dated March 22, 2020, stating that it still would not provide him with a copy of his file disclosure.

56.     Because of Trans Union's failure to provide Mr. Christian with a copy of his file disclosure and refusal to remove the inaccurate information from his credit report, Mr. Christian suffered actual damages, including credit damage and emotional distress.

*Plaintiff Alejandro Garcia Venegas*

57.     In November 2021, Mr. Garcia Venegas, a California consumer, applied for a mortgage.  To evaluate his mortgage application, his lender obtained Mr. Garcia Venegas's tri-merge credit report from Factual Data.

58.     As part of this application, Mr. Garcia Venegas provided his date of birth and other personal identifying information so Trans Union could provide a report to Factual Data.

59.     In assembling Mr. Garcia Venegas's tri-merge report, Factual Data requested his credit information from Trans Union, including a Trans Union IDVision report.

60.     Trans Union reported inaccurate information about Mr. Garcia Venegas to Factual Data.

61.     Trans Union returned an IDVision report about Mr. Garcia Venegas stating his Social Security Number was used in a death benefits claim:

| IDVISION ALERT | INPUT INPUT SSN IS INVALID - POTENTIAL ITIN | TRU |
| IDVISION ALERT | INPUT INPUT CONSUMER IDENTITY ELEMENTS - VERIFIED | TRU |
| DEATH RECORD | DEATH CLAIM RPTD: 07/28/1967<br>DECEDENT: THOMPSON , EUGENE, DATE OF BIRTH: 01/18/1921. | TRU |

62.     This information was incorrect.

63.     Trans Union should also have easily been able to exclude this information from Mr. Garcia Venegas's report: Mr. Garcia Venegas was born in 1974—seven years after the death benefits claim was made.

64.     Even worse, Mr. Garcia Venegas does not even have a Social Security Number—he has an ITIN.  Trans Union knew that he had an ITIN, as reflected in the IDVision report above.  As a result, he was not eligible to receive benefits from the Social Security Administration and no one could claim such benefits after his death.

65.     This inaccurate reporting meant that he had no Trans Union credit score:

```
TransUnion | CLASSIC 04 SCORE
NOT SCORED: ADDITIONAL ID VERIFICATION
REQUIRED. CONTACT 800-216-3463
SCORE RANGE: 309-839
```

66.     Even though his Equifax and Experian credit scores were in the 700s, Mr. Garcia Venegas's mortgage application was denied because of Trans Union's inaccurate reporting and refusal to score his file because it reported him as deceased.

67.     Upon information and belief, Trans Union published the same or a similar IDVision report about Mr. Garcia Venegas to other third parties within the last five years, including to Bank of America on February 10, 2020 and State Farm on January 13, 2020.

68.     In early 2022, Mr. Garcia Venegas dispute the inaccurate death benefits claim reporting with Trans Union, who removed the inaccurate information from his report. Upon information and belief, Trans Union removed this information because it was clear from the face of the report that it did not belong to Mr. Garcia Venegas.

*Plaintiff Leslie Richardson*

69.     Within the last five years, Trans Union has reported to several third parties that Ms. Richardson's Social Security Number was used in a death benefits claim, including to the best of her recollection as part of a mortgage application in 2018.

70.     Upon information and belief, Trans Union reported this alert, or a substantially similar alert to those entities:

```
*** IDVISION ALERT ***
4 - RICHARDSON, LESLIE BEVERLY
* 4501 - INPUT SSN LIKELY NOT ISSUED PRIOR TO JUNE 2011
* 6000 - FILE SSN USED IN DEATH BENEFITS CLAIM FOR BARBARA BURNS.DOB:06/08/1934.DOC:09/03/2017
```

71.     This information was incorrect.

72.     Trans Union should also have easily been able to exclude this information from Ms. Richardson's report: Ms. Richardson has never used the name "Barbara Burns" and she was not born in 1934.

73.     These errors occurred because Ms. Richardson was using an ITIN, and did not have a social security number at the time of her credit applications in 2018.

74.     This inaccurate reporting meant that she had no Trans Union credit score:

> TRANSUNION/FICO CLASSIC (04) - LESLIE B RICHARDSON - *****2304
> SCORE: N/A
> SC2 - FILE NOT SCORED BECAUSE SUBJECT IS DECEASED

75.     Ms. Richardson suffered damages from Trans Union's reporting, including no credit score and credit denials.

*Plaintiff Jose Alberto Aleman Lopez*

76.     Within the last five years, Trans Union has reported to several third parties that Mr. Aleman Lopez's Social Security Number was used in a death benefits claim, including: Hy-Cite on February 8, 2021.

77.     Upon information and belief, Trans Union reported to one of more of these entities that Mr. Aleman Lopez was deceased with the following (or a similar) notification:

> TRANSUNION/FICO CLASSIC (04) - JOSE A ALEMAN LOPEZ - *****8172
> SCORE: N/A
> SC2 - FILE NOT SCORED BECAUSE SUBJECT IS DECEASED

78.     This information was incorrect.

79.     Mr. Aleman Lopez did not know that Trans Union reported him as deceased until years later, when he requested his file disclosure from Trans Union in December 2021.

80.     Mr. Aleman Lopez's file disclosure stated that Mr. Aleman Lopez's Social Security Number had been used in a death benefits claim for Helen Klass:

81.     This information was incorrect.

82.     Trans Union should also have easily been able to exclude this information from Mr. Aleman Lopez's report: Mr. Aleman Lopez has never used the name "Helen Klass" and he was not born in 1888.

83.     Mr. Aleman Lopez was born in 1988—ten years after Ms. Klass's death benefits claim was filed.

84.     Even worse, Mr. Aleman Lopez does not even have a Social Security Number—he has an ITIN.  Because of the formatting, Trans Union knew that he had an ITIN instead of a Social Security Number.  As a result, he was not eligible to receive benefits from the Social Security Administration and no one could claim such benefits upon his death.

85.     As shown above, Trans Union's inaccurate reporting resulted in Mr. Aleman Lopez having no Trans Union credit score.

86.     As a result of Trans Union's inaccurate reporting, Mr. Aleman Lopez's credit application was denied.

87.     Then, on January 2, 2022, Mr. Aleman Lopez wrote Trans Union to dispute the inaccurate information about the death benefits notation. He explained that he had never filed a death benefit claim and that he did not know Helen Klass.

88.     In response to Mr. Aleman Lopez's dispute, Trans Union failed to conduct an adequate investigation and remove the information from Mr. Aleman Lopez's report.

89.     Because of Trans Union's refusal to remove the inaccurate information from his credit report, Mr. Aleman Lopez suffered actual damages, including credit damage and emotional distress.

*Plaintiff Jose Santiago Gutama Criollo*

90.     Within the last five years, Trans Union has reported to several third parties that Mr. Gutama Criollo's Social Security Number was used in a death benefits claim, including: Synchrony Bank on September 5, 2021, February 22, 2021, August 4, 2020, and December 26, 2020; Paramount Residential on August 21, 2020; Loan Depot via Credco on August 6, 2021, and Capital One on February 26, 2020, July 13, 2021, and May 17, 2020.

91.     Upon information and belief, Trans Union reported this alert, or a substantially similar alert to those entities:

TRANSUNION/FICO CLASSIC (04) - JOSE S GUTAMA SR - *****6522
SCORE: N/A
SC2 - FILE NOT SCORED BECAUSE SUBJECT IS DECEASED

92.     This information was incorrect.

93.     Mr. Gutama Criollo called Trans Union and disputed that he should be reported as deceased.

94.     Trans Union failed to conduct any investigation of his dispute, and continued to report him as deceased to potential creditors.

95.     Mr. Gutama Criollo did not know that Trans Union reported him as deceased until a year later, when he requested his file disclosure from Trans Union in September 2021.

96.     Mr. Gutama Criollo's file disclosure stated that Mr. Gutama Criollo's Social Security Number had been used in a death benefits claim:

14

**Mensajes Especiales**

Se pueden suministrar los siguientes Mensajes especiales a una parte autorizada cuando ésta realiza una consulta acerca de su informe de crédito de TransUnion. Estos mensajes brindan detalles importantes en relación con la información contenida en su archivo y/o la consulta de la parte autorizada.

NUMERO DE SEGURO SOCIAL USADO EN RECLAMO DE BENEFICIOS POR MUERTE

97.     This information was incorrect.

98.     Mr. Gutama Criollo does not even have a Social Security Number—he has an ITIN. Because of the formatting, Trans Union knew that he had an ITIN instead of a Social Security Number.   As a result, he was not eligible to receive benefits from the Social Security Administration and no one could claim such benefits upon his death.

99.     As shown above, Trans Union's inaccurate reporting resulted in Mr. Gutama Criollo having no Trans Union credit score.

100.     As a result of Trans Union's inaccurate reporting, Mr. Gutama Criollo suffered actual damages, including a decreased credit score and credit denials.

101.     Then, on January 2, 2022, Mr. Gutama Criollo wrote Trans Union to dispute the inaccurate information about the death benefits notation. He explained that he had never filed a death benefit claim and that he didn't even have a social security number.

102.     In response to Mr. Gutama Criollo's dispute, Trans Union failed to conduct an adequate investigation and remove the information from Mr. Gutama Criollo's report.

103.     Instead, it updated the report and added an alert that Mr. Gutama Criollo's social security number was likely issued after 2011. This was still incorrect because, as he explained in his dispute letter, Mr. Gutama Criollo doesn't have a social security number.

104.     Because of Trans Union's refusal to remove the inaccurate information from his credit report, Mr. Gutama Criollo suffered actual damages, including credit damage and emotional distress.

*Trans Union Willfully Violated the FCRA*

15

105.    Trans Union's failure to maintain reasonable procedures to ensure that its reports were as accurate as possible was willful and carried out in knowing or reckless disregard for consumers' rights under the FCRA.  Trans Union's conduct was intentionally accomplished through its intended procedures; these procedures have continued even though other consumer reporting agencies have faced court decisions and consumer complaints critical of similar conduct; and Trans Union will continue to engage in this conduct because it believes there is greater economic value in selling over-inclusive consumer reports rather than accurate ones.

106.    If Trans Union had reasonable procedures to ensure that the information it published about consumers to its customers was as accurate as possible, it would not have included death benefit claims on reports that, on their face, did not belong to Plaintiffs.  These records had many problems, including mismatched names, dates of birth, being attributed to consumers who were not eligible for Social Security benefits because they did not even have a Social Security Number, and claim dates before the consumer's birth.

107.    Trans Union knows about the FCRA's requirement that the information it reports about consumers must be as accurate as possible and that its erroneous reporting violates this requirement.

108.    For example, in 2015, the New York Attorney General was forced to sue Trans Union due to its conduct in mixing consumer credit files.  In the settlement, Trans Union agreed to    implement    procedures    to    ensure    accurate    reporting.    *See* https://ag.ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf.

109.    Shortly after, the lawsuit resulted in an Agreement of Assurances between Trans Union and several Attorneys General relating to the Trans Union's responsibilities to prevent mixed files.  Trans Union entered into an "Assurance of Voluntary Compliance" to ensure that it

would implement changes.  http://www.myfloridalegal.com/EC_Edoc.nsf/0/3D93314A8135213B

85257E5B00611557/%24file/Equifax+Experian+TransUnion+05-20-2015.pdf

110.    Despite this extensive notice, Trans Union's computer system still causes mixed

files because Trans Union does not require or use full identifying information for a potential credit

grantor's inquiry even when unique identifiers such as a full Social Security Number or ITIN are

present.  Trans Union does this to sell more credit reports.

111.    Trans Union's computer system failures are especially prevalent when consumers,

like several Plaintiffs, have ITINs rather than Social Security Numbers.

112.    Discovery will show that Trans Union's computer system does not preclude

matching consumers without Social Security Numbers with consumers who only have ITINs

because Trans Union's system treats these two numbers as though they can be matched to one

another.

113.    Discovery will show that Trans Union has been alerted to the fact that it is causing

mixed consumer files for consumers who have an ITIN and not a Social Security Number.

114.    Even though it recognizes its mixed file problem, Trans Union knowingly chooses

to ignore it, even when it leads to erroneous death benefits reporting.  This is true even though it

already possesses simple, easy, and inexpensive means to correct and avoid the problem.

115.    Trans Union has also been sued repeatedly for failing to prevent mixed consumer

files.  *See, e.g.*, *Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir. 1996); *Guimond v. Trans*

*Union Credit Info. Co.*, 45 F.3d 1329 (9th Cir. 1995); *O'Conner v. Trans Union Corp.*, No. 97-

4633, 1999 WL 773504 (E.D. Pa. Sept. 29, 1999); *Thomas v. Trans Union*, C.A. No. 00-1150 (D.

Or. 2002) (jury verdict of $5.3 million remitted to $1.3 million); *Soghomonian v. Trans Union*,

(E.D. Cal.) ($990,000 verdict); *Price v. Trans Union, LLC*, 737 F. Supp. 2d 281 (E.D. Pa. 2010);

*Neclerio v. Trans Union, LLC*, Civ. No. 3:11cv1317 (D. Conn. Aug. 17, 2011).

116.   Despite these lawsuits and enforcement actions, Trans Union has not changed its

procedures to ensure that the credit reports that it prepares, publishes, and maintains are as accurate

as possible, as required by the FCRA at 15 U.S.C. § 1681e(b).

**COUNT I – FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681e(b)**
**Class Claim**

117.   Under Fed. R. Civ. P. 23, Plaintiffs bring this action for themselves and on behalf

of the following class:

> All natural persons residing in the United States who: (a) were the subject of a
> report sold by Trans Union; (b) in the five years predating the filing of the initial
> Complaint and continuing through the date on which the class list is prepared; (c)
> which resulted in no credit score because Trans Union indicated the consumer was
> deceased and (d) which included a Social Security death benefits claim that had
> been filed where the consumer whose death benefits were claimed had (1) a
> different name and date of birth than the class member or (2) had a Social Security
> Number when the subject of the report had an ITIN.

118.   Mr. Garcia Venegas also brings this action for himself and on behalf of the

following subclass:

> All natural persons residing in the United States who: (a) were the subject of a
> report sold by Trans Union; (b) in the five years predating the filing of the initial
> Complaint and continuing through the date on which the class list is prepared; (c)
> which resulted in no credit score because Trans Union indicated the consumer was
> deceased; (d) which included a Social Security death benefits claim that had been
> filed where the consumer whose death benefits were claimed had (1) a different
> name and date of birth than the class member or (2) had a Social Security Number
> when the subject of the report had an ITIN; and (e) Trans Union's records show
> that the Social Security death benefits claim was subsequently removed based on a
> dispute from the consumer.

119.   **Numerosity.** Plaintiffs estimate that the class is so numerous that joinder of all

members is impractical.   The class members' names and addresses are identifiable through

documents maintained by Trans Union and the class members may be notified of the pendency of this action by published, mailed notice, or both.

120. **Predominance of Common Questions of Law and Fact.** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members.  These common questions predominate over the questions affecting only individual class members.  The common questions include: (1) whether Trans Union had in place reasonable procedures designed to avoid the reporting of death benefits claims involving individuals with different names and dates of birth or who had ITINs and were not eligible to receive death benefits; (2) whether Trans Union's conduct violated the FCRA; and (3) whether Trans Union's conduct was willful.

121. **Typicality.** Plaintiffs' claims are typical of the claims of each putative class member.  Plaintiffs are entitled to relief under the same causes of action as the other putative class members.  Plaintiffs' claims are also based on the same facts and legal theories as each of the class members' claims.

122. **Adequacy of Representation.** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the other putative class members.  Plaintiffs have retained counsel competent and experienced in class action litigation and intend, with their counsel, to continue to prosecute the action vigorously. Plaintiffs and their counsel will adequately protect the class members' interests.  Neither Plaintiffs nor their counsel have any interest that might conflict with their vigorous pursuit of this action.

123. **Superiority.** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  The damages sought by each class

member are such that individual prosecution would prove burdensome and expensive.  It would be almost impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts.  Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Trans Union's conduct.  By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

124.    As described above, Trans Union includes information about death benefits claims even though the record clearly does not belong to the subject of the report, either because the names and dates of birth do not match or because the person is not eligible to receive the benefit because they have an ITIN.

125.    Trans Union violated the FCRA, § 1681e(b), as to Plaintiffs and each of the class members by misattributing Social Security death benefits claims to consumers that, from the face of the record, did not belong to them, and then reported the consumers as deceased.

126.    As described above, Trans Union had in place no procedures designed to prevent these violations, which are apparent by even a cursory review of the records on which Trans Union was relying.

127.    Plaintiffs and each putative class member suffered real and actual harm and injury.

128.    For example, the rights at issue were determined by Congress to be important measures to ensure continued accuracy and completeness in Trans Union's files and reports.

129.    Class members also were falsely painted as potential fraudsters seeking to use a false Social Security Number to obtain credit to their prospective creditors.

130.     Trans Union's conduct was willful, rendering it liable for statutory and punitive damages under 15 U.S.C. § 1681n.  In the alternative, the violation was negligent, rendering Trans Union liable under 15 U.S.C. § 1681o.

131.     As a result of these FCRA violations, Trans Union is liable for statutory damages from $100.00 to $1,000.00 for Plaintiffs and each class member, punitive damages, attorneys' fees, and costs under 15 U.S.C. § 1681n.

## COUNT II –
## CALIFORNIA'S CONSUMER CREDIT REPORTING AGENCIES ACT
### Cal. Civ. Code § 1785.13(b)
### Plaintiff Garcia Venegas's Class Claim

132.     Mr. Garcia Venegas restates each of the preceding allegations.

133.     Under Fed. R. Civ. P. 23, Mr. Garcia Venegas brings this action for himself and on behalf of the following class:

> All natural persons located in California who: (a) were the subject of a report sold by Trans Union; (b) in the five years predating the filing of the initial Complaint and continuing through the date on which the class list is prepared; (c) which resulted in no credit score because Trans Union indicated the consumer was deceased and (d) which included a Social Security death benefits claim that had been filed where the consumer whose death benefits were claimed had (1) a different name and date of birth than the class member or (2) had a Social Security Number when the subject of the report had an ITIN.

134.     **Numerosity.** Mr. Garcia Venegas estimates that the class is so numerous that joinder of all members is impractical.  The class members' names and addresses are identifiable through documents maintained by Trans Union and the class members may be notified of the pendency of this action by published, mailed notice, or both.

135.     **Predominance of Common Questions of Law and Fact.** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members.  These common questions predominate over the

questions affecting only individual class members.  The common questions include: (1) whether Trans Union had in place reasonable procedures designed to avoid the reporting of death benefits claims involving individuals with different names and dates of birth or who had ITINs and were not eligible to receive death benefits; (2) whether Trans Union's conduct violated the CCRAA; and (3) whether Trans Union's conduct was willful.

136.   **Typicality.** Mr. Garcia Venegas's claims are typical of the claims of each putative class member.  Mr. Garcia Venegas is entitled to relief under the same causes of action as the other putative class members.  Mr. Garcia Venegas's claims are also based on the same facts and legal theories as each of the class members' claims.

137.   **Adequacy of Representation.** Mr. Garcia Venegas is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the other putative class members.  Mr. Garcia Venegas has retained counsel competent and experienced in class-action litigation and intends, with his counsel, to continue to prosecute the action vigorously.  Mr. Garcia Venegas and his counsel will adequately protect the class members' interests.  Neither Mr. Garcia Venegas nor his counsel have any interest that might conflict with his vigorous pursuit of this action.

138.   **Superiority.** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  The damages sought by each class member are such that individual prosecution would prove burdensome and expensive.  It would be almost impossible for individual class members to effectively redress the wrongs done to them.  Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts.  Individualized litigation also presents a potential for inconsistent or contradictory

judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Trans Union's conduct.  By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

139.    As described above, Trans Union includes information about death benefits claims even though the record clearly does not belong to the subject of the report, either because the names and dates of birth do not match or because the person is not eligible to receive the benefit because they have an ITIN.

140.    Trans Union violated the CCRAA, § 1785.13(b), as to Mr. Garcia Venegas and each of the class members by misattributing Social Security death benefits claims to consumers that, from the face of the record, did not belong to them, and then reported the consumers as deceased.

141.    As described above, Trans Union had in place no procedures designed to prevent these violations, which are apparent by even a cursory review of the records on which Trans Union was relying.

142.    Mr. Garcia Venegas and each putative class member suffered real and actual harm and injury.

143.    For example, the rights at issue were determined by Congress to be important measures to ensure continued accuracy and completeness in Trans Union's files and reports.

144.    Class members also were falsely painted as potential fraudsters seeking to use a false Social Security Number to obtain credit to their prospective creditors.

145.    Trans Union's conduct was willful, rendering it liable for statutory and punitive damages under § 1785.31(a)(2) of the CCCRA.  In the alternative, the violation was negligent, rendering Trans Union liable under § 1785.31(a)(1) of the CCCRA.

146.    In addition, Plaintiff Garcia Venegas and class members are entitled to injunctive relief under § 1785.31(b) of the CCCRA.  On behalf of himself and other California consumers, Plaintiff Garcia Venegas seeks a court order prohibiting Trans Union from reporting any IDVision death benefit reports with the inaccuracies identified above and requiring it to send notice to class members stating that it will no longer report this information.

### COUNT III – NEW YORK'S FAIR CREDIT REPORTING ACT
### NY Gen. Bus. Law § 380-j(e)
### Plaintiff Gutama Criollo's Class Claim

147.    Mr. Gutama Criollo restates each of the preceding allegations.

148.    Under Fed. R. Civ. P. 23, Mr. Gutama Criollo brings this action for himself and on behalf of the following class:

> All natural persons located in New York who: (a) were the subject of a report sold by Trans Union; (b) in the five years predating the filing of the initial Complaint and continuing through the date on which the class list is prepared; (c) which resulted in no credit score because Trans Union indicated the consumer was deceased and (d) which included a Social Security death benefits claim that had been filed where the consumer whose death benefits were claimed had (1) a different name and date of birth than the class member or (2) had a Social Security Number when the subject of the report had an ITIN.

149.    **Numerosity.** Mr. Gutama Criollo estimates that the class is so numerous that joinder of all members is impractical.  The class members' names and addresses are identifiable through documents maintained by Trans Union and the class members may be notified of the pendency of this action by published, mailed notice, or both.

150.    **Predominance of Common Questions of Law and Fact.** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that

differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether Trans Union had in place reasonable procedures designed to avoid the reporting of death benefits claims involving individuals with different names and dates of birth or who had ITINs and were not eligible to receive death benefits; (2) whether Trans Union's conduct violated New York's Fair Credit Reporting Act; and (3) whether Trans Union's conduct was willful.

151.    **Typicality.** Mr. Gutama Criollo's claims are typical of the claims of each putative class member. Mr. Gutama Criollo is entitled to relief under the same causes of action as the other putative class members. Mr. Gutama Criollo's claims are also based on the same facts and legal theories as each of the class members' claims.

152.    **Adequacy of Representation.** Mr. Gutama Criollo is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the other putative class members. Mr. Gutama Criollo has retained counsel competent and experienced in class action litigation and intends, with his counsel, to continue to prosecute the action vigorously. Mr. Gutama Criollo and his counsel will adequately protect the class members' interests. Neither Mr. Gutama Criollo nor his counsel have any interest that might conflict with his vigorous pursuit of this action.

153.    **Superiority.** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each class member are such that individual prosecution would prove burdensome and expensive. It would be almost impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on

the courts.  Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Trans Union's conduct.  By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

154.    As described above, Trans Union includes information about death benefits claims even though the record clearly does not belong to the subject of the report, either because the names and dates of birth do not match or because the person is not eligible to receive the benefit because they have an ITIN.

155.    Trans Union violated New York's Fair Credit Reporting Act, § 380-j(e), as to Mr. Gutama Criollo and each of the class members by misattributing Social Security death benefits claims to consumers that, from the face of the record, did not belong to them, and then reported the consumers as deceased.

156.    As described above, Trans Union had in place no procedures designed to prevent these violations, which are apparent by even a cursory review of the records on which Trans Union was relying.

157.    Mr. Gutama Criollo and each putative class member suffered real and actual harm and injury.

158.    For example, the rights at issue were determined by Congress to be important measures to ensure continued accuracy and completeness in Trans Union's files and reports.

159.    Class members also were falsely painted as potential fraudsters seeking to use a false Social Security Number to obtain credit to their prospective creditors.

160.    Trans Union's conduct was willful, rendering it liable for punitive damages under § 380-l of New York's Fair Credit Reporting Act.  In the alternative, the violation was negligent, rendering Trans Union liable under § 380-m of the statute.

161.    In addition, Plaintiff Gutama Criollo and class members are entitled to injunctive relief to rectify Trans Union's unlawful practices.  On behalf of himself and other New York consumers, Plaintiff Gutama Criollo seeks a court order prohibiting Trans Union from reporting any IDVision death benefits reports with the inaccuracies identified above and requiring it to send notice to class members stating that it will no longer report this information.

## COUNT IV–FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i
**Plaintiff Gutama Criollo's, Christian's, and Aleman Lopez's Individual Claim**

162.    Mr. Gutama Criollo, Mr. Christian, and Mr. Aleman Lopez restate each of the preceding allegations.

163.    Trans Union violated multiple sections of § 1681i, including but not limited to: (1) failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from Plaintiffs Gutama Criollo's, Christian's, and Aleman Lopez's credit files in violation of § 1681i(a)(1); (2) failing to review and consider all relevant information submitted by Plaintiffs Gutama Criollo, Christian, and Aleman Lopez in violation of §1681i(a)(4); (3) failing to promptly delete the disputed inaccurate items of information from Plaintiffs Gutama Criollo's, Christian's, and Aleman Lopez's credit file or modify the item of information upon a lawful reinvestigation of § 1681i(a)(5)(A); and (4) failing to promptly delete the disputed, inaccurate information from Plaintiffs Gutama Criollo's, Christian's, and Aleman Lopez's credit file in violation of §1681i(a)(5)(A).

164.     As a result of Trans Union's conduct, Plaintiffs Gutama Criollo, Christian, and Aleman Lopez suffered concrete and particularized harm, including without limitation: credit damage, damage to reputation, embarrassment, humiliation, and other emotional distress.

165.     Trans Union's conduct in violating § 1681i was willful, rendering them liable to Plaintiffs Gutama Criollo, Christian, and Aleman Lopez for actual damages, statutory damages, punitive damages, costs, and attorneys' fees in an amount to be determined pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant was negligent, which entitles Plaintiffs Gutama Criollo, Christian, and Aleman Lopez to recover under 15 U.S.C. § 1681o.

## COUNT IV–FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681g(a)
### Plaintiff Christian's Individual Claim

166.     Mr. Christian restates each of the preceding allegations.

167.     Trans Union violated the FCRA, 15 U.S.C. §1681g(a) by failing to provide a complete copy of Plaintiff Christian's file upon his request.

168.     As a result of Trans Union's conduct, Plaintiff Christian suffered actual damages including, the denial of important information. The right to this information was determined by Congress to be important measures of Trans Union's process to ensure continued accuracy and completeness in its files and reports.

169.     Trans Union's conduct was willful, rendering it liable for punitive damages under 15 U.S.C. §1681n.  In the alternative, it was negligent, entitling Plaintiff Christian to recover under 15 U.S.C. §1681o.

170.     Plaintiff Christian is also entitled to recover actual damages, statutory damages, costs, and attorneys' fees under 15 U.S.C. §1681n and §1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the putative class members, move for class certification and for statutory, actual, and punitive damages as pleaded, injunctive relief, and their attorneys' fees and costs against Trans Union; for prejudgment and post-judgment interest at the legal rate, and any other relief the Court considers appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the classes, demand a trial by jury on all issues triable by a jury.

Dated: September 27, 2022      /s/Joseph C. Hashmall

Joseph C. Hashmall, *pro hac vice*
E. Michelle Drake, *pro hac vice*
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 594-5999
Facsimile: (612) 584-4470
Email: jhashmall@bm.net
      emdrake@bm.net

Shanon J. Carson, Bar No. 85957
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-4656
Facsimile: (215) 875-4604
Email: scarson@bm.net

Kristi C. Kelly, *pro hac vice*
Andrew J. Guzzo,  *pro hac vice*
Casey Nash, *pro hac vice*
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

Email: casey@kellyguzzo.com

*Counsel for Plaintiffs*