**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

RICKY CHRISTIAN, LESLIE RICHARDSON,  :
JOSE ALBERTO ALEMAN LOPEZ,            :
MICHELLE FYDA and MADISON ELLIOT,     :
*for themselves and all similarly*    :
*situated individuals*,               :
                                      :
                          Plaintiffs, :    Civil Action No. 2:22-2253 (MSG)
                                      :
v.                                    :
                                      :
TRANS UNION, LLC,                     :
                                      :
                          Defendant.  :
_____:

### SECOND AMENDED COMPLAINT

Plaintiffs Ricky Christian, Leslie Richardson, Jose Alberto Aleman Lopez, Michelle Fyda and Madison Elliot, by counsel, for themselves and all similarly situated individuals, bring the following Class Action Complaint against Defendant Trans Union, LLC ("Trans Union"). For their Complaint, they allege as follows:

### INTRODUCTION

1.      When enacting the Fair Credit Reporting Act ("FCRA"), Congress found that consumer reporting agencies "have assumed a vital role in assembling and evaluating . . . information on consumers." 15 U.S.C. § 1681(a)(3). Thus, Congress saw a need to ensure that consumer reporting agencies "exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." *Id.* § 1681(a)(4). To accomplish Congress' goal, the FCRA contains several requirements to protect consumers, including § 1681e(b), which is one of the statute's cornerstone provisions.

2.      Section 1681e(b) requires that consumer reporting agencies follow reasonable procedures to assure maximum possible accuracy of the information on the individuals about

1

whom they report.  15 U.S.C. § 1681e(b).  This section imposes a high standard on consumer reporting agencies.  *See, e.g.*, *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011) (breaking down the requirements of § 1681e(b) and explaining that "'assure' means 'to make sure or certain: put beyond all doubt,'" "'[m]aximum' means the 'greatest in quantity or highest degree attainable[,]' and 'possible' means something 'falling within the bounds of what may be done, occur or be conceived'" (quoting *Webster's Third New International Dictionary* 133, 1396, 1771 (1993))).

3.     Trans Union violated § 1681e(b) by issuing reports indicating that consumers were dead when, in fact, the consumers were alive. Similarly, Trans Union includes statements in its reports indicating that consumers' Social Security Numbers had been linked to a claim for Social Security death benefits. Because of this, it refuses to issue credit scores on such consumers, thereby conveying that they should be ineligible for credit.

4.     Trans Union persisted in reporting this information even when the consumer's name and date of birth did not match the name and date of birth of the individual associated with the death benefit claims.  Sometimes, the death benefit claim had been made years before Trans Union's records showed the consumer was even born. Trans Union even reports this information about consumers who had an Individual Taxpayer Identification Number ("ITIN") rather than a Social Security Number.

5.     Plaintiffs were all falsely marked as deceased in Trans Union's reports to their potential creditors, resulting in "no" credit score and an inability to obtain credit.

6.     Trans Union could have prevented these inaccuracies and resulting harm by requiring a name and date of birth match between the consumer and the person associated with the death benefits claim, or by excluding Social Security Number matches from the reports of

consumers who had ITINs. Indeed, Trans Union inaccurately labeled the Plaintiffs as deceased even though it was apparent—based on other information in their file—that Plaintiffs were alive and actively using credit.

7.      Government regulators and courts have warned credit reporting agencies that such failures are a violation of § 1681e(b). By way of example, the Federal Trade Commission has explained that reasonable procedures to assure maximum possibly accuracy require "establish[ing] procedures to avoid reporting information from its furnishers that appears implausible or inconsistent."[1] The Consumer Financial Protection Bureau has likewise instructed credit bureaus to implement procedures to prevent the reporting of "illogical information relating to consumers," such as when "every other tradeline [in a credit report] is reporting ongoing payment activity, while one tradeline contains a 'deceased' indicator." CFPB Advisory Opinion on Fair Credit Reporting; *Facially False Data*, at 9, October 20, 2022.

8.      Trans Union's failure to implement these simple and commonsense safeguards violated the FCRA's mandate that it "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b).  Because the putative class members were subject to the same procedures and suffered the same overarching harm, Plaintiffs' § 1681e(b) claims are capable and appropriate for class resolution.

---

[1] FTC, *40 Years of Experience with the Fair Credit Reporting Act: An FTC Report with Summary of Interpretations* 67 (July 2011), available at https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over Plaintiffs' claims under 15 U.S.C. § 1681p, which allows FCRA claims to be brought in any appropriate court of competent jurisdiction.

10.     The Court has personal jurisdiction over Defendant.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendant resides in this district.

12.     Venue is also proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that form the basis of the lawsuit occurred at 2 Baldwin Place, Chester, PA 19022.

## PARTIES

13.     Each Plaintiff is a natural person and a consumer as defined by 15 U.S.C. § 1681a(c).

14.     Defendant Trans Union, LLC ("Trans Union" or "Defendant") is a limited liability company with a principal place of business located at 2 Baldwin Place, Chester, PA 19022.  Trans Union is authorized to do business in the State of Pennsylvania, including in this county.

15.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f).

## FACTS

*Trans Union Touts its Cutting-Edge Fraud Prevention Report*

16.     In the United States, consumer reporting is a highly profitable multi-billion-dollar industry dominated by three agencies: Equifax, Experian, and Trans Union.

17.     Each of these companies' business models depend on assembling as much information on American consumers as possible, then selling that information to their customers—largely banks and finance companies—to use in evaluating consumers' credit applications.

4

18.     Because each agency receives similar information from many of their sources (creditors and public record depositories), one way that these competitors seek to gain competitive advantages in the market is by collecting as much data as possible and then developing unique, specialized reports to help their customers minimize risk.

19.     For example, Trans Union boasts that it has "over 50 petabytes of data, growing at an average rate of approximately 25% per year since 2010 . . . 90,000 data sources, including financial institutions, private databases and public records repositories. We refine, standardize and enhance this data using sophisticated algorithms to create proprietary databases. . . . We believe we are the largest provider of scale in the United States to possess both nationwide consumer credit data and comprehensive, diverse public records data, which allows us to better predict behaviors, assess risk and address a broader set of business issues for our customers." Trans Union, Annual Report (Form 10-K) 1 (Feb. 13, 2018), available at https://investors.transunion.com/~/media/Files/T/Transunion-IR/annual-reports/2017/tru-2017-annual-report.pdf.

20.     Trans Union focuses its data and reports on helping its paying customers: "our data, analytics and decisioning capabilities allow businesses to authenticate the identity of consumers, effectively determine the most relevant products for consumers, retain and cross-sell to existing consumers, identify and acquire new consumers and reduce loss from fraud." *Id.* at 1-2.

21.     Trans Union sells multiple credit reporting products that contain different information.  One product Trans Union has developed is designed to help lenders identify and avoid fraudulent transactions.

22.     Trans Union debuted this product, first called IDVision, in January 2017. https://newsroom.transunion.com/transunion-introduces-idvision-to-help-businesses-prevent-- sophisticated-and-evolving-fraud-and-identity-theft/.

23.     According to Trans Union, IDVision "brings together robust data assets with advanced analytics technology that links, interprets and analyzes information to discover anomalies and patterns of risk. Businesses receive actionable alerts and instantly delivered scores so they can make timely decisions." https%3A%2F%2Fnewsroom.transunion.com%2Ftransunion-introduces-idvision-to-help- businesses-prevent--sophisticated-and-evolving-fraud-and-identity-theft%2F.

24.     Trans Union marketed IDVision as being a highly accurate predictor of potentially fraudulent activity.

25.     Recently, it appears that Trans Union has rebranded IDVision as TruValidate.

26.     TruValidate has the same main goal: to help Trans Union's paying customers prevent fraud-based losses in the lending process.

27.     TruValidate is an important product for Trans Union: Trans Union recently bought Neustar, a premier identity resolution company, for $3.1 billion, in order to expand and strengthen its IDVision/TruValidate product.  https://www.acainternational.org/news/transunion-to-acquire- neustar-for-3-billion/.

*Trans Union's Over-Inclusive Fraud Predictors*

28.     One item included as part of Trans Union's IDVision product (and in other products sold by Trans Union) is information regarding whether a consumer's Social Security Number has been used in a death benefits claim from the Social Security Administration.

6

29.     If accurate, this information would allow Trans Union's customers to avoid transactions in which fraudsters were attempting to obtain credit using a dead person's Social Security Number.

30.     In actuality, however, Trans Union—perhaps to help boost its marketing numbers and make it seem like the product identifies more instances of fraud than it actually does—uses overly loose criteria when adding a death benefits flag to a consumer's file.

31.     Trans Union has repeatedly flagged consumers as dead or potential fraudsters using a suspect Social Security Number that was the subject of a death benefits claim, even though the information about the person who was the subject of the death benefits claim does not match the consumer's name, address, or date of birth.

32.     This inaccuracy is clear from the face of the report, yet Trans Union does not employ any reasonable procedures to exclude this inaccurate and misleading information from its consumer reports.

33.     Even worse, once the information about the death benefits claim is added to the consumer's file, Trans Union marks the consumer as deceased and refuses to provide a credit score about the consumer.

34.     This inaccurate and misleading reporting has a devastating impact on a consumer's credit file—once a deceased notation is added, no credit score will be generated for that consumer and the consumer will be unable to obtain credit.

*Trans Union's Inaccurate Reporting Also Impacts Immigrants*

35.     Trans Union's inaccurate reporting is not limited to consumers who have Social Security Numbers.

36.     Instead, consumers who have Individual Tax Identification Numbers ("ITINs") are also impacted by Trans Union's lax matching procedures.

37.     Individuals may have an ITIN at one point in their lives and a Social Security Number at another, but never both simultaneously.

38.     ITINs are easily distinguishable from Social Security Numbers.  Like Social Security Numbers, ITINs are nine digits.  Unlike Social Security Numbers, however, all ITINs start with "9" and have a range of numbers from "50" to "65", "70" to "88", "90" to "92" and "94" to "99" for the fourth and fifth digits.  INTERNAL REVENUE SERVICE, PUBLICATION 1915, UNDERSTANDING YOUR IRS INDIVIDUAL TAXPAYER IDENTIFICATION NUMBER ITIN 5 (2021) (available at https://www.irs.gov/pub/irs-pdf/p1915.pdf).

39.     Trans Union knows when a consumer has an ITIN rather than a Social Security Number.

40.     In fact, Trans Union knows its customers regularly furnish information about consumers with ITINs for inclusion in their credit files.

41.     Despite these obvious differences between ITINs and Social Security Numbers, Trans Union does not have any meaningful procedures in place to prevent it from reporting a Social Security Number death benefits alert about a consumer who has an ITIN.

42.     Again, this has a devastating impact on these consumers, as it results in the consumer being labeled as deceased with "no" credit score.

*Plaintiff Ricky Christian*

43.     Within the last five years, Trans Union has reported to several third parties that Mr. Christian's Social Security Number was used in a death benefits claim, including: Servion, Inc. via Advantage Credit, Inc. on March 9, 2021; Hayes RV Center on April 19, 2021; Safeco

8

Insurance on March 26, 2021 and January 7, 2021; Allstate Insurance on March 26, 2021; National

General Insurance on January 7, 2021; and Liberty Mutual on January 7, 2021.

44.     Upon information and belief, Trans Union reported this alert, or a substantially

similar alert to those entities:

---

**TU IDVISION ALERT**

\*\*\* IDVISION ALERT \*\*\*
3 - CHRISTIAN, RICKY
\* 6000 - FILE SSN USED IN DEATH BENEFITS CLAIM FOR THURMAN GARNER.DOB:08/27/1903.DOC:12/01/1976.ZIP CODE LAST
RESIDENCE IS 76471,MOST LIKELY RISING STAR,TX

---

45.     This information was incorrect.

46.     Trans Union should also have easily been able to exclude this information from Mr.

Christian's report: Mr. Christian has never used the name "Thurman Garner" and he was not born

in 1903.

47.     Trans Union also received and reported information in his credit file from its

customers about him after 1976- which is the year the ID Vision Alert said he was deceased.

48.     This inaccurate reporting meant that he had no Trans Union credit score:

TRANSUNION/FICO CLASSIC (04) - RICKY L CHRISTIAN SR - ▉▉▉▉▉
SCORE: **N/A**
SC2 - FILE NOT SCORED BECAUSE SUBJECT IS DECEASED

49.     Because of this inaccurate reporting, Mr. Christian suffered actual damages,

including a reduced credit score and credit denials.

50.     Then, on April 23, 2021, Mr. Christian called Trans Union to dispute the inaccurate

information about the death benefits notation.

51.     In response to Mr. Christian's dispute, Trans Union failed to conduct an adequate

investigation and remove the information from Mr. Christian's report.

52.     Mr. Christian continued to check his Trans Union report to see if the inaccurate information had been removed. But on one or more occasions, Trans Union refused to provide Mr. Christian with a copy of his file.

53.     For example, Mr. Christian requested a copy of his file disclosure in December 2021, but Trans Union sent him a letter dated December 29, 2021 stating that it would not provide him with a copy and asked for additional information to verify his identity.

54.     Mr. Christian provided this information, but Trans Union still refused to provide him with a copy of his file.

55.     Instead, Trans Union sent Mr. Christian a letter dated March 22, 2020, stating that it still would not provide him with a copy of his file disclosure.

56.     Because of Trans Union's failure to provide Mr. Christian with a copy of his file disclosure and refusal to remove the inaccurate information from his credit report, Mr. Christian suffered actual damages, including credit damage and emotional distress.

*Plaintiff Leslie Richardson*

57.     Within the last five years, Trans Union has reported to several third parties that Ms. Richardson's Social Security Number was used in a death benefits claim, including to the best of her recollection as part of a mortgage application in 2018.

58.     Trans Union reported this alert, or a substantially similar alert to those entities:

```
*** IDVISION ALERT ***
4 - RICHARDSON, LESLIE BEVERLY
* 4501 - INPUT SSN LIKELY NOT ISSUED PRIOR TO JUNE 2011
* 6000 - FILE SSN USED IN DEATH BENEFITS CLAIM FOR BARBARA BURNS.DOB:06/08/1934.DOC:09/03/2017
```

59.     This information was incorrect.

60.     Trans Union should also have easily been able to exclude this information from Ms. Richardson's report: Ms. Richardson has never used the name "Barbara Burns" and she was not born in 1934.

61.     Trans Union also received and reported information in her credit file with her creditors after the ID Vision Alert said she was deceased.

62.     These errors occurred because Ms. Richardson was using a Canadian identification number, and did not have a United States social security number at the time of her credit applications in 2018.

63.     This inaccurate reporting meant that she had no Trans Union credit score:

> TRANSUNION/FICO CLASSIC (04) - LESLIE B RICHARDSON - *****2304
> SCORE: **N/A**
> SC2 - FILE NOT SCORED BECAUSE SUBJECT IS DECEASED

64.     Ms. Richardson suffered damages from Trans Union's reporting, including no credit score and credit denials.

*Plaintiff Jose Alberto Aleman Lopez*

65.     Within the last five years, Trans Union has reported to several third parties that Mr. Aleman Lopez's Social Security Number was used in a death benefits claim, including: Hy-Cite on February 8, 2021.

66.     Upon information and belief, Trans Union reported to one of more of these entities that Mr. Aleman Lopez was deceased with the following (or a similar) notification:

> TRANSUNION/FICO CLASSIC (04) - JOSE A ALEMAN LOPEZ - *****8172
> SCORE: **N/A**
> SC2 - FILE NOT SCORED BECAUSE SUBJECT IS DECEASED

67.     This information was incorrect.

68.     Mr. Aleman Lopez did not know that Trans Union reported him as deceased until years later, when he requested his file disclosure from Trans Union in December 2021.

69.     Mr. Aleman Lopez's file disclosure stated that Mr. Aleman Lopez's Social Security Number had been used in a death benefits claim for Helen Klass:

**Special Messages**

The following Special Messages may be provided to an authorized party when it requests your TransUnion credit report. These messages provide important details concerning the information contained in your file and/or the authorized party's inquiry.

FILE SSN USED IN DEATH BENEFITS CLAIM FOR HELEN KLASS. DOB:03/19/1888. DOC:03/01/1978. ZIP CODE LAST RESIDENCE IS 90066. MOST LIKELY LOS ANGELES, CA

70.     This information was incorrect.

71.     Trans Union should also have easily been able to exclude this information from Mr. Aleman Lopez's report: Mr. Aleman Lopez has never used the name "Helen Klass" and he was not born in 1888.

72.     Mr. Aleman Lopez was born in 1988—ten years after Ms. Klass's death benefits claim was filed.

73.     Trans Union also received and reported information from its customers in his credit file after 1978.

74.     Even worse, Mr. Aleman Lopez does not even have a Social Security Number—he has an ITIN.  Because of the formatting, Trans Union knew that he had an ITIN instead of a Social Security Number.  As a result, he was not eligible to receive benefits from the Social Security Administration and no one could claim such benefits upon his death.

75.     As shown above, Trans Union's inaccurate reporting resulted in Mr. Aleman Lopez having no Trans Union credit score.

76.     As a result of Trans Union's inaccurate reporting, Mr. Aleman Lopez's mortgage application was denied.

77.     Then, on January 2, 2022, Mr. Aleman Lopez wrote Trans Union to dispute the inaccurate information about the death benefits notation. He explained that he had never filed a death benefit claim and that he did not know Helen Klass.

78.     In response to Mr. Aleman Lopez's dispute, Trans Union failed to conduct an adequate investigation and remove the information from Mr. Aleman Lopez's report.

79.     Because of Trans Union's refusal to remove the inaccurate information from his credit report, Mr. Aleman Lopez suffered actual damages, including credit damage and emotional distress.

*Plaintiff Michelle Fyda*

80.     Within the last five years, Trans Union has reported to several third parties that Ms. Fyda's Social Security Number was used in a death benefits claim, including but not limited to: Synchrony Bank on behalf of PayPal on September 9, 2022; Tony's Auto Sales on April 21, 2021; and Oportun/MetaBank on September 28, 2021.

81.     Trans Union reported to one of more of these entities that Mrs. Fyda was deceased.

82.     This information was incorrect.

83.     Ms. Fyda's file disclosure states that her Social Security Number had been used in a death benefits claim for a Homer Earl:

INPUT SSN USED IN DEATH BENEFITS CLAIM FOR HOMER EARL.DOB:11/08/1899.DOC:03/01/1966.

84.     This information was incorrect.

85.     Trans Union should also have easily been able to exclude this information from Ms. Fyda's report: Ms. Fyda has never used the name "Homer Earl" and she was not born in 1899.

86.     Ms. Fyda was born in 1997—ninety-eight years after Mr. Earl, and thirty-one years after Mr. Earl's death benefits claim was filed.

87.     Trans Union also received and reported information from its customers in her credit file with her creditors after 1966.

88.     Trans Union's inaccurate reporting resulted in Ms. Fyda's having no Trans Union credit score.

89.     As a result of Trans Union's inaccurate reporting, Ms. Fyda's debt card, auto loan and home loan applications were denied.

90.     Because of Trans Union's inaccurate reporting, Ms. Fyda suffered actual damages, including credit damage and emotional distress.

*Plaintiff Madison Elliot*

91.     Within the last five years, Trans Union has reported to several third parties that Ms. Elliot's Social Security Number was used in a death benefits claim, including but not limited to in June 2021 and November 2022 to Wells Fargo, and within the last six months to AM Rent, a rental screening company that in turn reported that information to Plaintiff's prospective landlord.

92.      Trans Union reported to one or more of these entities that Ms. Elliot was deceased.

93.     This information was incorrect.

94.     Trans Union's reporting indicated that Ms. Elliot's Social Security Number was used in a death benefits claim on April 1, 1968.

95.     This information was incorrect.

96.     Trans Union should also have easily been able to exclude this information from Ms. Elliot's report: Ms. Elliot was born in 1999—thirty-one years after the death benefits claim was filed.

97.     Trans Union also received and reported information from its customers in her credit file after 1968.

98.     Trans Union's inaccurate reporting resulted in Ms. Elliot having no Trans Union credit score.

99.     As a result of Trans Union's inaccurate reporting, Ms. Elliot's two credit card applications were denied, and Ms. Elliot's apartment rental application was complicated and delayed.

100.    Because of Trans Union's misreporting, Mr. Elliot suffered actual damages, including credit damage and emotional distress.

*Trans Union Willfully Violated the FCRA*

101.    Trans Union's failure to maintain reasonable procedures to ensure that its reports were as accurate as possible was willful and carried out in knowing or reckless disregard for consumers' rights under the FCRA.  Trans Union's conduct was intentionally accomplished through its intended procedures; these procedures have continued even though other consumer reporting agencies have faced court decisions and consumer complaints critical of similar conduct; and Trans Union will continue to engage in this conduct because it believes there is greater economic value in selling over-inclusive consumer reports rather than accurate ones.

102.    If Trans Union had reasonable procedures to ensure that the information it published about consumers to its customers was as accurate as possible, it would not have included death benefit claims on reports that, on their face, did not belong to Plaintiffs.  These records had many problems, including mismatched names, dates of birth, being attributed to consumers who were not eligible for Social Security benefits because they did not even have a Social Security Number, and claim dates before the consumer's birth.

103.    Trans Union knows about the FCRA's requirement that the information it reports about consumers must be as accurate as possible and that its erroneous reporting violates this requirement.

104.    For example, in 2015, the New York Attorney General was forced to sue Trans Union due to its conduct in mixing consumer credit files.  In the settlement, Trans Union agreed to implement procedures to ensure accurate reporting.  *See* https://ag.ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf.

105.    Shortly after, the lawsuit resulted in an Agreement of Assurances between Trans Union and several Attorneys General relating to the Trans Union's responsibilities to prevent mixed files.  Trans Union entered into an "Assurance of Voluntary Compliance" to ensure that it would implement changes.  http://www.myfloridalegal.com/EC_Edoc.nsf/0/3D93314A8135213B 85257E5B00611557/%24file/Equifax+Experian+TransUnion+05-20-2015.pdf

106.    Despite this extensive notice, Trans Union's computer system still causes mixed files because Trans Union does not require or use full identifying information for a potential credit grantor's inquiry even when unique identifiers such as a full Social Security Number or ITIN are present.  Trans Union does this to sell more credit reports.

107.    Trans Union's computer system failures are especially prevalent when consumers, like Plaintiff Aleman Lopez, have ITINs rather than Social Security Numbers.

108.    Discovery will show that Trans Union's computer system does not preclude matching consumers without Social Security Numbers with consumers who only have ITINs because Trans Union's system treats these two numbers as though they can be matched to one another.

109.    Discovery will show that Trans Union has been alerted to the fact that it is causing mixed consumer files for consumers who have an ITIN and not a Social Security Number.

110.     Even though it recognizes its mixed file problem, Trans Union knowingly chooses to ignore it, even when it leads to erroneous death benefits reporting.  This is true even though it already possesses simple, easy, and inexpensive means to correct and avoid the problem.

111.     Trans Union has also been sued repeatedly for failing to prevent mixed consumer files.  *See, e.g.*, *Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir. 1996); *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329 (9th Cir. 1995); *O'Conner v. Trans Union Corp.*, No. 97-4633, 1999 WL 773504 (E.D. Pa. Sept. 29, 1999); *Thomas v. Trans Union*, C.A. No. 00-1150 (D. Or. 2002) (jury verdict of $5.3 million remitted to $1.3 million); *Soghomonian v. Trans Union*, (E.D. Cal.) ($990,000 verdict); *Price v. Trans Union, LLC*, 737 F. Supp. 2d 281 (E.D. Pa. 2010); *Neclerio v. Trans Union, LLC*, Civ. No. 3:11cv1317 (D. Conn. Aug. 17, 2011).

112.     Despite these lawsuits and enforcement actions, Trans Union has not changed its procedures to ensure that the credit reports that it prepares, publishes, and maintains are as accurate as possible, as required by the FCRA at 15 U.S.C. § 1681e(b).

### COUNT I – FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b)
### Class Claim

113.     Under Fed. R. Civ. P. 23, Plaintiffs bring this action for themselves and on behalf of the following class:

> All natural persons residing in the United States who: (a) were the subject of a report sold by Trans Union; (b) in the five years predating the filing of this Complaint and continuing through the date on which the class list is prepared; (c) where Trans Union indicated the consumer was deceased; (d) when the consumer: (1) had a different name and date of birth than the person whose was associated with the Social Security Death Benefits Claim; (2) applied with an ITIN but was matched with a decedent who had a social security number; or (3) had ongoing pay activities on multiple tradelines.

114.     Mr. Christian and Mr. Aleman Lopez also brings this action for himself and on behalf of the following subclass:

All natural persons residing in the United States who: (a) were the subject of a report sold by Trans Union; (b) in the five years predating the filing of this Complaint and continuing through the date on which the class list is prepared; (c) where Trans Union indicated the consumer was deceased; (d) when the consumer: (1) had a different name and date of birth than the person whose was associated with the Social Security Death Benefits Claim; (2) applied with an ITIN but was matched with a decedent who had a social security number; or (3) had ongoing pay activities on multiple tradelines; and (e) disputed the deceased indicator with Trans Union.

115.   **Numerosity.** Plaintiffs estimate that the class is so numerous that joinder of all members is impractical.   The class members' names and addresses are identifiable through documents maintained by Trans Union and the class members may be notified of the pendency of this action by published, mailed notice, or both.

116.   **Predominance of Common Questions of Law and Fact.** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members.   These common questions predominate over the questions affecting only individual class members.   The common questions include: (1) whether Trans Union had in place reasonable procedures designed to avoid the reporting of death benefits claims involving individuals with different names and dates of birth or who had ITINs and were not eligible to receive death benefits; (2) whether Trans Union's conduct violated the FCRA; and (3) whether Trans Union's conduct was willful.

117.   **Typicality.** Plaintiffs' claims are typical of the claims of each putative class member.  Plaintiffs are entitled to relief under the same causes of action as the other putative class members.  Plaintiffs' claims are also based on the same facts and legal theories as each of the class members' claims.

118.   **Adequacy of Representation.** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the

other putative class members.  Plaintiffs have retained counsel competent and experienced in class action litigation and intend, with their counsel, to continue to prosecute the action vigorously. Plaintiffs and their counsel will adequately protect the class members' interests.  Neither Plaintiffs nor their counsel have any interest that might conflict with their vigorous pursuit of this action.

119.   **Superiority.** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  The damages sought by each class member are such that individual prosecution would prove burdensome and expensive.  It would be almost impossible for individual class members to effectively redress the wrongs done to them. Even if the class members could afford individual litigation, it would be an unnecessary burden on the courts.  Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Trans Union's conduct.  By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve several individual claims based on a single set of proof in a case.

120.   As described above, Trans Union includes information about death benefits claims even though the record clearly does not belong to the subject of the report, either because the names and dates of birth do not match or because the person is not eligible to receive the benefit because they have an ITIN.

121.   Trans Union violated the FCRA, § 1681e(b), as to Plaintiffs and each of the class members by misattributing Social Security death benefits claims to consumers that, from the face of the record, did not belong to them, and then reported the consumers as deceased.

122.    As described above, Trans Union had in place no procedures designed to prevent these violations, which are apparent by even a cursory review of the records on which Trans Union was relying.

123.    Plaintiffs and each putative class member suffered real and actual harm and injury.

124.    For example, the rights at issue were determined by Congress to be important measures to ensure continued accuracy and completeness in Trans Union's files and reports.

125.    Class members also were falsely painted as potential fraudsters seeking to use a false Social Security Number to obtain credit to their prospective creditors.

126.    Trans Union's conduct was willful, rendering it liable for statutory and punitive damages under 15 U.S.C. § 1681n.  In the alternative, the violation was negligent, rendering Trans Union liable under 15 U.S.C. § 1681o.

127.    As a result of these FCRA violations, Trans Union is liable for statutory damages from $100.00 to $1,000.00 for Plaintiffs and each class member, punitive damages, attorneys' fees, and costs under 15 U.S.C. § 1681n.

**COUNT II–FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681i**
**Plaintiff Christian's and Aleman Lopez's Individual Claim**

128.    Mr. Christian and Mr. Aleman Lopez restate each of the preceding allegations.

129.    Trans Union violated multiple sections of § 1681i, including but not limited to: (1) failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from Plaintiffs Christian' and Aleman Lopez's credit files in violation of § 1681i(a)(1); (2) failing to review and consider all relevant information submitted by Plaintiffs Christian and Aleman Lopez in violation of §1681i(a)(4); (3) failing to promptly delete the disputed inaccurate items of

information from Plaintiffs Christian's and Aleman Lopez's credit file or modify the item of information upon a lawful reinvestigation of § 1681i(a)(5)(A); and (4) failing to promptly delete the disputed, inaccurate information from Plaintiffs Christian's and Aleman Lopez's credit file in violation of §1681i(a)(5)(A).

130.    As a result of Trans Union's conduct, Plaintiffs Christian, and Aleman Lopez suffered concrete and particularized harm, including without limitation: credit damage, damage to reputation, embarrassment, humiliation, and other emotional distress.

131.    Trans Union's conduct in violating § 1681i was willful, rendering them liable to Plaintiffs Christian and Aleman Lopez for actual damages, statutory damages, punitive damages, costs, and attorneys' fees in an amount to be determined pursuant to 15 U.S.C. § 1681n. In the alternative, Defendant was negligent, which entitles Plaintiffs Christian and Aleman Lopez to recover under 15 U.S.C. § 1681o.

**COUNT III–FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681g(a)**
**Plaintiff Christian's Individual Claim**

132.     Mr. Christian restates each of the preceding allegations.

133.    Trans Union violated the FCRA, 15 U.S.C. §1681g(a) by failing to provide a complete copy of Plaintiff Christian's file upon his request.

134.    As a result of Trans Union's conduct, Plaintiff Christian suffered actual damages including, the denial of important information. The right to this information was determined by Congress to be important measures of Trans Union's process to ensure continued accuracy and completeness in its files and reports.

135.    Trans Union's conduct was willful, rendering it liable for punitive damages under 15 U.S.C. §1681n.  In the alternative, it was negligent, entitling Plaintiff Christian to recover under 15 U.S.C. §1681o.

136.    Plaintiff Christian is also entitled to recover actual damages, statutory damages, costs, and attorneys' fees under 15 U.S.C. §1681n and §1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the putative class members, move for class certification and for statutory, actual, and punitive damages as pleaded, injunctive relief, and their attorneys' fees and costs against Trans Union; for prejudgment and post-judgment interest at the legal rate, and any other relief the Court considers appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the classes, demand a trial by jury on all issues triable by a jury.

Date: February 15th, 2023

By: /s/ *Andrew J. Guzzo*
Kristi C. Kelly, *pro hac vice*
Andrew J. Guzzo,  *pro hac vice*
Casey Nash, *pro hac vice*
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com

Joseph C. Hashmall, *pro hac vice*
E. Michelle Drake, *pro hac vice*
BERGER MONTAGUE PC

22

1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 594-5999
Facsimile: (612) 584-4470
Email: jhashmall@bm.net
Email: emdrake@bm.net

Shanon J. Carson, Bar No. 85957
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-4656
Facsimile: (215) 875-4604
Email: scarson@bm.net

*Counsel for Plaintiffs*