**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| RICKY CHRISTIAN, LESLIE RICHARDSON, JOSE ALBERTO ALEMAN LOPEZ, MICHELLE FYDA, MADISON ELLIOTT, and JENNIFER APARICIO, *for themselves and all similarly situated individuals*,<br><br>Plaintiffs,<br><br>v.<br><br>TRANS UNION, LLC,<br><br>Defendant. | No. 2:22-cv-2253 (MSG)<br><br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 3

    A.    TransUnion Reported Consumers as Deceased and Withheld Credit Scores Based Solely on SSN-Only Matches to the SSA Death Master File, Even Where Other Personal Information Did Not Match.................................................. 3

    B.    TransUnion Issued ███████████████ of Inaccurate Consumer Reports Falsely Labeling Plaintiffs and Class Members as Deceased and Withholding Credit Scores from Potential Creditors. ............................................. 7

    C.    The Proposed Class ................................................................................................ 8

ARGUMENT ....................................................................................................................... 9

I.    THE PROPOSED CLASS IS ASCERTAINABLE. ...................................................... 10

II.    THE PROPOSED CLASS SATISFIES FED. R. CIV. P. 23(a). .................................... 12

    A.    The Class is Numerous. ......................................................................................... 12

    B.    Common Questions of Fact and Law Exist. .......................................................... 12

    C.    Class Plaintiffs' Claims Are Typical of Those of Absent Class Members. ........... 13

    D.    Class Plaintiffs and Their Counsel Will Adequately Represent the Class. ........... 14

III.    THE PROPOSED CLASS SATISIFES FED. R. CIV. P. 23(b)(3). ............................... 14

    A.    Common Questions of Fact and Law Predominate. ............................................. 14

    B.    A Class Action Is Superior to Other Available Means of Adjudication. .............. 16

IV.    TRANSUNION'S ANTICIPATED COUNTERARGUMENTS WILL FAIL. ................ 17

    A.    TransUnion's Claims of Hypothetical Businesses, Test Names, or "Synthetic Identities" in the Jaffe Proposed Class Will Fail to Defeat Certification. ........................................................................................................... 17

    B.    TransUnion's Hypothetical Claims of "Collections" Requests in the Jaffe Proposed Class Will Fail to Defeat Certification. ................................................. 20

    C.    Common Issues Will Predominate at Trial, Notwithstanding TransUnion's Vague and Unsubstantiated Claims of Class Member "Fraud." ........................... 22

CONCLUSION .................................................................................................................... 25

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)................................................................................................14

*Bibbs v. Trans Union LLC*,
    43 F.4th 331 (3d Cir. 2022) ......................................................................................5

*Brooks v. Trans Union LLC*,
    743 F. Supp. 3d 622 (E.D. Pa. 2024) ............................................................... *passim*

*Byrd v. Aaron's Inc.*,
    784 F.3d 154 (3d Cir. 2015)........................................................................10, 11, 19

*City Select Auto Sales Inc. v. BMW Bank of N. Am.*,
    867 F.3d 434 (3d Cir. 2017).......................................................................10, 11, 19

*Cole v. Am. Fam. Mut. Ins. Co.*,
    410 F. Supp. 2d 1020 (D. Kan. 2006)......................................................................22

*In re Cmty. Bank of N. Va.*,
    795 F.3d 380 (3d Cir. 2015)...........................................................12, 13, 14, 15, 18

*Cortez v. Trans Union, LLC*,
    617 F.3d 688 (3d Cir. 2010).................................................................................1, 2

*Feliciano v. CoreLogic Rental Prop. Sols., LLC*,
    332 F.R.D. 98 (S.D.N.Y. 2019) .....................................................................9, 13, 16

*Hargrove v. Sleepy's LLC*,
    974 F.3d 467 (3d Cir. 2020)........................................................................10, 19, 21, 22

*Kelly v. RealPage Inc.*,
    47 F.4th 202 (3d Cir. 2022) ..............................................................................11, 21

*Long v. Se. Pennsylvania Transportation Auth.*,
    903 F.3d 312 (3d Cir. 2018)......................................................................................7

*McAdam v. Dean Witter Reynolds, Inc.*,
    896 F.2d 750 (3d Cir. 1990).....................................................................................22

*McIntyre v. RealPage, Inc.*,
    336 F.R.D. 422 (E.D. Pa. 2020).......................................................................... *passim*

*In re Nat'l Football League Players Concussion Inj. Litig.*,
    821 F.3d 410 (3d Cir. 2016).....................................................................................13

*Norman v. Trans Union, LLC,*
   479 F. Supp. 3d 98 (E.D. Pa. 2020) ...............................................................................13, 14

*Norman v. Trans Union, LLC,*
   669 F. Supp. 3d 351 (E.D. Pa. 2023) .....................................................................................25

*Pinter v. Dahl,*
   486 U.S. 622 (1988).................................................................................................................22

*Ramirez v. Trans Union, LLC,*
   No. 12-cv-00632, ECF No. 309 (N.D. Cal. June 21, 2017)......................................................13

*Robins v. Spokeo, Inc.,*
   867 F.3d 1108 (9th Cir. 2017) ..............................................................................................6, 7

*Soutter v. Equifax Info. Servs., LLC,*
   307 F.R.D. 183 (E.D. Va. 2015) .......................................................................9, 13, 16, 19, 21

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021).................................................................................................................6

*Tyson Foods, Inc. v. Bouaphakeo,*
   577 U.S. 442 (2016).................................................................................................................15

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011).................................................................................................................13

**Statutes & Rules**

15 U.S.C. § 1681 *et seq.*........................................................................................ *passim*

Fed. R. Civ. P. 23.....................................................................................10, 12, 13, 14, 16

**Other Authorities**

1 MCLAUGHLIN ON CLASS ACTIONS § 4:2 (21st ed. 2024) ............................................................11

7 NEWBERG ON CLASS ACTIONS § 21:4 (6th ed. 2022)..................................................................16

*Brooks v. Trans Union, LLC,*
   No. 22-cv-00048-KSM, ECF No. 123 (E.D. Pa. Aug. 19, 2024) ....................................11, 20

*Lab. Corp. of Am. Holdings v. Davis*, No. 24-304, 2025 WL 880773, Brief of
   Claims Administrators as *Amici Curiae* in Support of Neither Party, (U.S. ar-
   gued Apr. 29, 2025), ..............................................................................................................19

EQUIFAX, *Credit and Debt After Death: What You Need to Know,*
   https://www.equifax.com/personal/education/life-stages/articles/-/learn/credit-
   accounts-after-death/.................................................................................................................6

## PRELIMINARY STATEMENT

The Fair Credit Reporting Act ("FCRA") requires consumer reporting agencies like TransUnion to "follow reasonable procedures to assure maximum possible accuracy" of the information that they report to consumers' potential creditors.  15 U.S.C. § 1681e(b).  Nearly fifteen years ago, the Court of Appeals warned TransUnion that this "maximum possible accuracy" standard "requires more than merely allowing for the possibility of accuracy," and it upheld a jury verdict finding that TransUnion had fallen short of this standard by maintaining an automated procedure that purported to "match" consumers, using only a single identifier (*i.e.*, first or last name), to persons on the "OFAC SDN" list, a U.S.-government list of sanctioned terrorists and narcotraffickers with whom Americans are forbidden to do business.  *Cortez v. Trans Union, LLC*, 617 F.3d 688 (3d Cir. 2010).  In doing so, the court agreed with the jury that TransUnion had violated the FCRA by failing to take steps to improve its automated procedure "such as checking the birth date of the consumer against the birth date of the person on the SDN List."  *Id.* at 709.

Based on the experiences of Plaintiffs and members of the proposed Class in this litigation, however, TransUnion does not appear to have learned the lesson that the Court of Appeals tried to impart in *Cortez*.  Instead, for more than a decade between its loss in *Cortez* and the end of the Class Period,[1] TransUnion continued to use a single-identifier matching procedure to make another decision that can have an equally devastating impact on a consumer's financial life:  whether to report a consumer as "DECEASED" based on a purported match to a deceased person listed on the U.S. Social Security Administration's Death Master File (the "DMF").  Even though the DMF provides a full set of identifying information for each deceased person (full name, Social Security

---

[1] As defined below, the "Class Period" begins on May 17, 2020 and ends on June 30, 2024, when TransUnion discontinued its single-identifier DMF-matching procedure and replaced it ████████  *See* Declaration of E. Michelle Drake, Ex. 1, Def.'s 3d Supp. R&Os to Christian Interrogs., at 4–5.

number ("SSN"), date of birth, and date of death), TransUnion's "algorithm" ignored all but one: the deceased person's SSN, which it compared only against the "primary" SSN listed in the consumer's TransUnion file.

If these two numbers matched, that was the end of TransUnion's inquiry—it immediately refused to issue a credit score and instead announced to its subscriber: "FILE NOT SCORED BECAUSE SUBJECT IS DECEASED."  Just like the TransUnion procedure at issue in *Cortez*, this automated procedure considered only a single identifier (*i.e.*, SSN) when "matching" consumers to the DMF, ignoring the name and DOB information that was *also* included with each decedent's DMF entry.  And just like Sandra Cortez, whose TransUnion "OFAC ALERT" was based on a false match to a criminal who had a different middle name and a different date of birth, each of the Plaintiffs in this case was marked "DECEASED" based on a facially illogical "match" to an unrelated deceased person whose name and DOB bore no resemblance to his or her own.

TransUnion has acknowledged, as it must, that the Social Security Administration is the authoritative source of information about which SSN has been assigned to which person.[2]  Yet throughout the Class Period, TransUnion persisted with its SSN-only matching despite knowing that ███████████████████████████████████████████████████████████ Instead of immediately jumping to the conclusion that these consumers were "DECEASED," TransUnion should have reconsidered the SSNs it had assigned to these consumers, which were clearly wrong.

In this motion, Plaintiffs seek to certify a class of the ████████████████████ similarly situated consumers who have also been victims of false "DECEASED" reports resulting from

---

[2] *See* Ex. 2, TruValidate SSN Verification Product Support Guide (Feb. 16, 2023) at 6 ██████████ ██████████████████████████████████████████████████████████████ ██████████; Ex. 3, DeCeunynck Dep. at 37:21–38:12; Ex. 4, Landau Dep. at 50:11–51:7.

2

TransUnion's unreasonable DMF-matching procedures.  Because TransUnion's automated proce-dures applied uniformly to all Class members during the Class Period; because Plaintiffs have demonstrated a reliable and administratively feasible method for ascertaining the Class's member-ship based on TransUnion's own records; and because the willful nature of TransUnion's FCRA-violating conduct can be proven with common evidence, this case is well suited to class treatment, and the Court should grant Plaintiffs' motion.

## BACKGROUND

**A.    TransUnion Reported Consumers as Deceased and Withheld Credit Scores Based Solely on SSN-Only Matches to the SSA Death Master File, Even Where Other Personal Information Did Not Match.**

To understand why TransUnion's procedure during the Class Period for matching consum-ers to entries on the DMF was so unreasonable, it is helpful first to understand the general process by which TransUnion prepared a consumer report during the Class Period, which began when the company received a consumer-report request (sometimes referred to as a "credit inquiry") from one of its subscribers.  ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████    ██████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████

---

[3] ██████████████████████████████

[4] ████████████████████████████████

[5] ██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████

Next, TransUnion would identify the consumer file in its database that corresponded to the subject of the request. ██████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

Next, once this "subject selection" process identified a consumer file (or, in certain circum-stances, generated a new consumer file), TransUnion used another set of algorithms to assemble a consumer report from the information in the consumer's file. ████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████       ████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████When this happened, TransUnion used an "SSN ordering" algorithm to select the consumer's "primary" or "File" SSN.[8]

---

[6] █████████████████████████████████████████████████████████████████
███████████████████████████████

[7] ████████████████████████████████████████████████████████████
████████████████████████████████████████████

[8] This "SSN ordering" algorithm is explained in detail in the expert report of Dr. Craig Knoblock. ████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████ *See* Ex. 7, Knoblock Opening Rpt. at 18–24.

4

This litigation primarily concerns TransUnion's use of the File SSN during the Class Period to designate certain consumer files as "unscoreable" due to a match between the File SSN and the SSN of a deceased person listed on the DMF.  This procedure (the "DMF Matching Procedure") asked only one question:  whether the consumer's File SSN was an exact, nine-digit match to an SSN listed on the DMF.  If so, without considering any other information (such as name or date of birth, each of which was already listed alongside the SSN in both TransUnion's internal copy of the DMF[9] and in its consumer file), TransUnion would immediately (i) refuse to issue a credit score for the consumer, and (ii) add a response code to its consumer report that translated to "FILE NOT SCORED BECAUSE SUBJECT IS DECEASED."[10,11]

In other words, TransUnion's uniform policy during the Class Period, as embodied in this automated, algorithmic procedure, was to withhold a credit score and issue a "FILE NOT SCORED BECAUSE SUBJECT IS DECEASED" message code even when the consumer's name and date of birth were both *different* from the name and date of birth listed on the DMF for the decedent to whom TransUnion had supposedly "matched" the consumer.[12]  The DMF Matching

---

[9] Ex. 3, DeCeunynck Dep. at 160:23–161:14; Ex. 9, CHRISTIAN_TU_0216222 at 3; Ex. 10, Kubes Dep. at 157:15–158:7.

[10] Ex. 7, Knoblock Opening Rpt. at 5–8; Ex. 1, Def.'s 3d Supp. R&Os to Christian Interrogs. at 4–5; Ex. 11, TU4.0 User Guide (July 1, 2024), at 660–61; Ex. 12, Deposition of Trans Union, LLC ("30(b)(6) Dep.") at 110:25–111:19, 303:16–304:20; Ex. 13, Wodzinski Dep. at 104:3–23; Ex. 14, Plaintiff_Christian_000051 at -53.

[11] Additionally, if the subscriber that requested the consumer report had purchased and registered for "Fraud Alerts," TransUnion would also include a "Fraud Alert 6000" message, which included the identifying information from the DMF entry.  *See* Ex. 1, Def.'s 3d Supp. R&Os to Christian Interrogs. at 5; *see, e.g.*, Ex. 14, Plaintiff_Christian_000051 at -53 (March 2021 consumer report for Ricky Christian: "FILE SSN USED IN DEATH BENEFITS CLAIM FOR THURMAN GARNER. DOB: 08/27/1903. DOC: 12/01/1976.  ZIP CODE LAST RESIDENCE IS 76471, MOST LIKELY RISING STAR, TX"). TransUnion has suggested that the inclusion of this additional information rendered its reports accurate, despite its false statement that "SUBJECT IS DECEASED."  But even information that is "technically accurate" can trigger FCRA § 1681e(b) if it is "materially misleading," *Bibbs v. Trans Union LLC*, 43 F.4th 331, 345 (3d Cir. 2022), and in any event, because TransUnion's algorithm produced identically formatted Fraud Alert 6000 messages for all Class members whose reports included one, this is a common question that can be answered with common evidence.

[12] Ex. 12, 30(b)(6) Dep. at 127:25–129:13; Ex. 3, DeCeunynck Dep. at 27:25–32:4.

Procedure simply *ignored* the name and date-of-birth information listed on the Death Master File when purporting to decide whether a consumer was deceased.[13]  This often led to absurd results, such as consumer reports that marked consumers as "DECEASED" based on DMF matches to people who had died years or decades before the consumers were born.[14] ███████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████

As a result of TransUnion's DMF Matching Procedure, each of the Plaintiffs thus became the subject of a consumer report that contained a non-trivial falsehood (*i.e.*, that they were "DECEASED").  As Equifax has explained, this kind of message "flags a person's credit reports as 'deceased - do not issue credit.'"[16]  Worse, in addition to issuing consumer reports falsely stating that each of the Plaintiffs was "DECEASED," TransUnion *refused to issue credit scores* to Plaintiffs' potential creditors. [17]  This is more than sufficient to confer Article III standing.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 414 (2021) (class members who were the subject of misleading "OFAC Alerts" in consumer reports that TransUnion disseminated to third parties each "suffered a concrete harm that qualifies as an injury in fact"); *see also, e.g.*, *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1114 (9th Cir. 2017) ("*Spokeo II*") (on remand from Supreme Court, holding that plaintiff's FCRA allegations related to a CRA falsely stating that he was married with children and had a

---

[13] The DMF Matching Procedure also ignored indications that a consumer might not have an SSN at all, but might instead be the holder of an ITIN.  ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████

[14] ████████████████████████████████████████████████

[15] Ex. 12, 30(b)(6) Dep. at 129:23–131:9.

[16] EQUIFAX, *Credit and Debt After Death: What You Need to Know*, https://www.equifax.com/personal/education/life-stages/articles/-/learn/credit-accounts-after-death/ (last visited May 25, 2025), *archived at* https://perma.cc/7QQ8-QPRK; *see also* Ex. 16, Expert Report of Evan Hendricks ("Hendricks Opening Rpt.") at 9–12 (explaining the detrimental impacts of being reported as deceased).

[17] Ex. 1, Def.'s 3d Supp. R&Os to Christian Interrogs., at 5.

higher level of education and wealth than he actually possessed were sufficient to confer Article III standing); *Long v. Se. Penn. Transp. Auth.*, 903 F.3d 312, 321 & n.5 (3d Cir. 2018) (citing *Spokeo II* with approval and noting that the FCRA's accuracy provisions "resemble other reputational and privacy interests that have long been protected in the law, namely, the interest in avoiding intangible harms caused by . . . untruthful disclosures" (cleaned up)).

    **B.**    **TransUnion Issued** ▮▮▮▮▮▮▮▮▮ **of Inaccurate Consumer Reports Falsely Labeling Plaintiffs and Class Members as Deceased and Withholding Credit Scores from Potential Creditors.**

For years, TransUnion's unreasonable DMF Matching Procedure resulted in widespread, systemic inaccuracies in its consumer reports. With respect to each of the Class Plaintiffs,[18] for example, TransUnion sold consumer reports emblazoned with "FILE NOT SCORED BECAUSE SUBJECT IS DECEASED" based on facially false and illogical "matches" to unrelated deceased people listed on the DMF[19]:

| Class Plaintiffs | | TransUnion's DMF "Matches" | | |
|---|---|---|---|---|
| **Name** | **Date of Birth** | **DMF Decedent Name** | **DMF Date of Birth** | **DMF Date of Death** |
| Ricky Christian | ▮▮/1958 | Thurman Garner | ▮▮/1903 | ▮▮/1976 |
| Jose Alberto Aleman Lopez | ▮▮/1983 | Helen Klass | ▮▮/1888 | ▮▮/1978 |
| Michelle Fyda | ▮▮/1997 | Homer Earl | ▮▮/1899 | ▮▮/1966 |
| Madison Elliott | ▮▮/1999 | Ned Linn | ▮▮/1880 | ▮▮/1968 |
| Jennifer Aparicio | ▮▮/1990 | Eleanor Matranga | ▮▮/1913 | ▮▮/1981 |

Plaintiffs' analysis of a dataset produced by TransUnion (the "TransUnion Dataset") has revealed that, during the four-year Class Period, TransUnion issued more than ▮▮▮▮▮ consumer reports, concerning more than ▮▮▮▮ consumers, that included similarly false and illogical

---

[18] *See infra* note 23 and accompanying text.
[19] *See* Ex. 7, Knoblock Opening Rpt., at 8.

deceased indicators.  This estimate is based on the work of Plaintiffs' data-science expert, Mr. Jonathan Jaffe.  The results of Mr. Jaffe's analysis, along with detailed explanations of the methodologies he employed, are contained in his two expert reports.[20]  In short, to identify potential Class members from the TransUnion Dataset (which contained over ▇ columns of information concerning approximately ▇▇▇ consumer-report requests dating back to May 2017), Mr. Jaffe designed a set of sophisticated algorithmic procedures for identifying members of the Class—*i.e.*, consumers about whom TransUnion sold consumer reports to third parties with false "SUBJECT IS DECEASED" message codes, based on matches to DMF entries with non-matching names and dates of birth.  With respect to names, for example, Mr. Jaffe's algorithm performed over a billion name comparisons using dozens of permutations involving both the "input" and "file" first, middle, and last names for each listed consumer, as well as comparisons designed to identify nicknames, potential typos, and partial truncated names.[21]

### C.    The Proposed Class

In connection with Count I of the Third Amended Complaint (ECF No. 61), which alleges that TransUnion willfully[22] violated 15 U.S.C. § 1681e(b) by maintaining the DMF Matching Procedure, Plaintiffs Christian, Aleman Lopez, Fyda, Elliott, and Aparicio (the "Class Plaintiffs")[23] seek certification of the following Class:

---

[20] Ex. 17, Amended Expert Report of Jonathan Jaffe, Oct. 1, 2024 ("Jaffe Opening Rpt."); Ex. 18, Reply Expert Report of Jonathan Jaffe, Feb. 4, 2025 ("Jaffe Reply Rpt.").

[21] Ex. 18, Jaffe Reply Rpt., ¶ 237 & n.58.

[22] The Class Plaintiffs intend to seek only statutory and punitive damages for the Class under 15 U.S.C. § 1681n—not actual damages under 15 U.S.C. § 1681o.

[23] Plaintiff Leslie Richardson is not a member of the Class as defined herein.

> All natural persons ("Consumers") residing in the United States who, during the period from May 17, 2020 through June 30, 2024 (the "Class Period"), were the subject of one or more consumer reports issued by TransUnion that met all of the following conditions:
>
> (a)   TransUnion sold the consumer report to a third party for a purpose other than collections;
>
> (b)   TransUnion reported that the Consumer was deceased based on a match between the Consumer's then-existing TransUnion "file" Social Security number ("File SSN") and the Social Security number of a deceased person listed on the Social Security Administration's Death Master File;
>
> (c)   the Consumer's name was different[24] from the deceased person's name;
>
> (d)   the Consumer's date of birth was different from the deceased person's date of birth;
>
> (e)   the consumer report request that TransUnion received from the third party did not include an "input" Social Security number ("Input SSN") that was a nine-digit match to the deceased person's Social Security number, (*i.e.*, the value of the Input SSN that TransUnion received was different, or the field was blank); and
>
> (f)   the Consumer's current TransUnion file does not indicate that a creditor has reported the Consumer as deceased or that TransUnion has recorded a deceased date for the Consumer based on a death certificate or other documentation.

## ARGUMENT

Over the past decade, several courts in this District and elsewhere have certified classes of consumers challenging CRAs' inaccurate reporting under § 1681e(b) of the FCRA. *See, e.g.*, *Brooks v. Trans Union LLC*, 743 F. Supp. 3d 622 (E.D. Pa. 2024); *McIntyre v. RealPage, Inc.*, 336 F.R.D. 422 (E.D. Pa. 2020); *Feliciano v. CoreLogic Rental Prop. Sols., LLC*, 332 F.R.D. 98 (S.D.N.Y. 2019); *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183 (E.D. Va. 2015). In each of these cases, the crucial factor leading to certification was the court's finding that the policy or

---

[24] For purposes of the Class definition, whether names, dates of birth, and Input/File SSNs are "different" will be determined using the methods outlined in Mr. Jaffe's expert reports (which, in limited circumstances described therein, excludes from the Class certain inquiries with four-digit Input SSNs). *See* Ex. 17, Jaffe Opening Rpt., ¶¶ 55–69; Ex. 18, Jaffe Reply Rpt., ¶¶ 237–43, 253–57.

procedure at issue applied uniformly to all members of the proposed class. Just a few months ago, for example, in certifying a class of consumers in another FCRA § 1681e(b) action against TransUnion, Judge Marston granted certification based in part on her finding that the policy at issue "applied with equal, laser-like precision to every proposed class member." She reasoned:

> A jury could conclude that Trans Union's policy was either reasonable or unreasonable based on common evidence, and the jury would not need to do a case-by-case review to determine how Trans Union's uniform policy applied to each class member. Instead, the reasonableness of Trans Union's policy and Trans Union's intent in enacting that policy will be evidenced by the realities of the credit reporting industry and Trans Union's deliberations about how to conduct its business. Although individual cases could be used to illustrate how Trans Union's policy operates, these examples would only serve to exemplify the overall (ir)rationality of the policy as it was uniformly applied—*not* to demonstrate how Trans Union's policy was mis-applied in individual cases.

*Brooks*, 743 F. Supp. 3d at 647. This case is no different. Plaintiffs' motion should be granted.

## I.    THE PROPOSED CLASS IS ASCERTAINABLE.

Where, as here, a plaintiff seeks class certification under Rule 23(b)(3), courts in this Circuit require proof that the proposed class is "currently and readily ascertainable based on objective criteria." *City Select Auto Sales Inc. v. BMW Bank of N. Am.*, 867 F.3d 434, 438–39 (3d Cir. 2017). To satisfy this standard, a plaintiff must show, by a preponderance of the evidence, that (i) "the class is defined with reference to objective criteria," and (ii) "there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Id.* at 439.

Importantly, however, ascertainability does *not* require a plaintiff to "identify all class members at class certification" or to "demonstrate that a single record, or set of records, conclusively establishes class membership"—instead, a plaintiff need only show that "class members *can* be identified." *Id.* at 439, 441; *accord Hargrove v. Sleepy's LLC*, 974 F.3d 467, 470 (3d Cir. 2020); *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). This showing can be accomplished

in a number of different ways, including through a claims administrator's standard verification process, *see Byrd*, 784 F.3d at 170–71; by "[a]ffidavits, in combination with records or other reliable and administratively feasible means," *City Select*, 867 F.3d at 441; or even, if necessary, through a manual, file-by-file review of the defendant's records, regardless of the "number of files," so long as the review "is for information apparent on the face of the document." *Kelly v. RealPage Inc.*, 47 F.4th 202, 224–25 (3d Cir. 2022); *see also* 1 MCLAUGHLIN ON CLASS ACTIONS § 4:2 (21st ed. 2024) ("A defendant cannot defeat class certification . . . merely by showing some possibility that objective records will not identify unerringly all members of a proposed class. For example, available records can be over-inclusive, requiring additional work necessary to weed out non-class members.").

Here, the Class Plaintiffs have shown that the Class is ascertainable.  Indeed, through the work of their data-science expert, Mr. Jonathan Jaffe, the Class Plaintiffs have gone even further than required, and have affirmatively identified a proposed set of Class members (the "Jaffe Proposed Class") from among those consumers listed in a large credit-inquiry dataset produced by TransUnion (the "TransUnion Dataset").[25]  Should the Court nevertheless find that the Jaffe Proposed Class remains overinclusive, it can be further narrowed in a number of ways, including through the use of claims-administrator review and affidavits[26] or, if necessary, further production and analysis of TransUnion internal data.[27]  Alternatively, Mr. Jaffe has also identified subclasses within the Jaffe Proposed Class that the Court may elect to certify instead of (or in addition to) the Class as defined above, including ████████████████████████████████

---

[25] *See generally* Ex. 17, Jaffe Opening Rpt.; Ex. 18, Jaffe Reply Rpt.

[26] *See infra* sections IV.A & IV.B.

[27] *See, e.g.*, *Brooks v. Trans Union, LLC*, No. 22-cv-00048-KSM, ECF No. 123 (E.D. Pa. Aug. 19, 2024), at 3 ("TransUnion agrees to work cooperatively and jointly with Plaintiff and Mr. Jaffe to develop a workable process to extract relevant data from TransUnion's systems in order to identify members of the certified class.").



## II.   THE PROPOSED CLASS SATISFIES FED. R. CIV. P. 23(a).

### A.   The Class is Numerous.

A proposed class is "numerous" if it "is so large that joinder of all members is impractica-ble." Fed. R. Civ. P. 23(a)(1).  As shown in the reports submitted by Plaintiffs' data-science expert, Mr. Jonathan Jaffe, the Class includes ██████████████ consumers whom TransUnion inaccurately reported as deceased as a result of its unreasonable DMF Matching Procedure.[31]  The Class plainly satisfies the numerosity requirement.

### B.   Common Questions of Fact and Law Exist.

Rule 23(a)(2) requires "questions of law and fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The "focus of the commonality inquiry is not on the strength of each class member's claims but instead on whether the defendant's conduct was common as to all of the class mem-bers." *In re Cmty. Bank of N. Va.*, 795 F.3d 380, 397 (3d Cir. 2015) (cleaned up).  "In other words, as long as all putative class members were subjected to the same harmful conduct by the defendant, Rule 23(a) will endure many legal and factual differences among the putative class members." *Id.* Nevertheless, "what matters to class certification . . . is not the raising of common questions—

---

28 ████████████████████████
29 ██████████████████████████████
30 ████████████████████
31 ██████████████████████

even in droves—but rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 398 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).

Here, the primary question for the jury is a common one:  whether TransUnion's DMF Matching Procedure was a "reasonable procedure to assure maximum possible accuracy."  Because the procedure remained in place throughout the Class Period and "applied with equal, laser-like precision to every proposed class member," the jury will be able to generate a common *answer* to this question, and "conclude that TransUnion's policy was either reasonable or unreasonable based on common evidence." *Brooks*, 743 F. Supp. 3d at 647; *see also Norman v. Trans Union, LLC*, 479 F. Supp. 3d 98, 139–40 (E.D. Pa. 2020); *McIntyre*, 336 F.R.D. at 434–35.  Other common issues include:  (i) whether TransUnion's conduct was willful, (ii) the appropriate amount of statutory damages, and (iii) a possible award of punitive damages. *See, e.g.*, *Soutter*, 307 F.R.D. at 207–08; *Feliciano*, 332 F.R.D. at 106.  At trial, the jury will decide the relevant legal questions on a classwide basis and, if it finds TransUnion liable, it will then award statutory and punitive damages on a per-Class-member basis. *See, e.g.*, *Ramirez v. Trans Union, LLC*, No. 12-cv-00632, ECF No. 309 (N.D. Cal. June 21, 2017) (following jury verdict, entering post-trial judgment "in favor of Plaintiff and the Class and against Defendant Trans Union in the amount of $984.22 in statutory damages per class member and $6353.08 in punitive damages per class member").

**C.    Class Plaintiffs' Claims Are Typical of Those of Absent Class Members.**

Typicality is met if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 427–28 (3d Cir. 2016).  Once this

13

"low threshold" is met, typicality can only be defeated by a finding that the class representatives are "subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation." *Norman*, 479 F. Supp. 3d at 135–36 (cleaned up).

Here, Class Plaintiffs' claims are typical. TransUnion's automated DMF Matching Procedure caused it to issue consumer reports about each of the Class Plaintiffs and all Class members that all contained the same inaccurate response: "FILE NOT SCORED BECAUSE SUBJECT IS DECEASED." Classwide proof regarding the reasonableness of TransUnion's procedures, the willfulness of its conduct, and the appropriate relief will advance the claims of all Class members.

### D.    Class Plaintiffs and Their Counsel Will Adequately Represent the Class.

Rule 23(a)(4) requires a showing that named plaintiffs and their counsel will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The "primary purpose" of the adequacy requirement is to assess "whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class." *Cmty. Bank of N. Va.*, 795 F.3d at 393. Here, adequacy is satisfied. First, the Class Plaintiffs have secured representation from attorneys who have significant experience litigating complex class actions under the FCRA.[32] Second, each of the Class Plaintiffs has actively participated in this litigation, including by responding to discovery requests and sitting for depositions, and no conflicts exist between their interests and those of the Class; all share the same interest in receiving the FCRA's uniform statutory damages.

### III.    THE PROPOSED CLASS SATISIFES FED. R. CIV. P. 23(b)(3).

### A.    Common Questions of Fact and Law Predominate.

The "focus of the predominance inquiry" is whether "a proposed class is sufficiently cohesive to warrant adjudication by representation." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,

---

[32] *See* Drake Decl., ¶¶ 6–15; Declaration of Kristi C. Kelly, ¶¶ 2–14.

568 U.S. 455, 469 (2013) (cleaned up).  To answer this question, courts examine "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).  "If proof of the *essential elements* of the cause of action requires individual treatment, then class certification is unsuitable." *Cmty. Bank of N. Va.*, 795 F.3d at 399.

Here, the essential elements of Class Plaintiffs' claim for willful non-compliance with § 1681e(b) of the FCRA are "(1) inaccuracy and (2) a failure to follow reasonable procedures that is (3) knowing or reckless." *McIntyre*, 336 F.R.D. at 432.  There are, therefore, four questions at the heart of this litigation:  (i) whether, for each member of the Class, TransUnion's statement that "SUBJECT IS DECEASED" was inaccurate; (ii) whether TransUnion failed to "follow reasonable procedures to assure maximum possible accuracy"; (iii) if so, whether TransUnion's conduct was willful; and (iv) if so, the proper measure of statutory and punitive damages.

Each of these questions will be answered at trial using classwide evidence.  First, because the Class is defined to include only those consumers whose current TransUnion files are free of any indication that a creditor has reported them as deceased or that TransUnion has recorded a deceased date for them based on a death certificate,[33] the inaccuracy of TransUnion's "DE-CEASED" labels is a common question.  Second, the reasonableness of TransUnion's DMF

---

[33] *See supra* p. 9 (defining the Class to include only consumers whose "current TransUnion file does not indicate that a creditor has reported the Consumer as deceased or that TransUnion has recorded a deceased date for the Consumer based on a death certificate or other documentation"); Ex. 17, Jaffe Opening Rpt., ¶¶ 60–62.  In addition to Mr. Jaffe's extensive efforts to identify and exclude, through name and DOB analysis, any consumers whom TransUnion may have correctly matched to the DMF, this condition for Class membership ensures that the Class will be free of any consumers about whom TransUnion's "SUB-JECT IS DECEASED" statements were accurate, but only by coincidence—*i.e.*, consumers whose DMF matches were false but who were, in fact, deceased.  Neither TransUnion nor any of its experts has ever suggested that the Jaffe Proposed Class contains any meaningful number of these "accidentally accurate" deceased indicators, but to the extent that such consumers may exist, they can be excluded through the use of claims-administrator review and affidavits.  *See infra* sections IV.A & IV.B.

Matching Procedure—which remained in place, unchanged, throughout the Class Period and was thus "applied with equal, laser-like precision to every proposed class member," *Brooks*, 743 F. Supp. 3d at 647—is also a common question. Third, willfulness is a common question, especially where, as here, "the challenged behavior takes the form of a policy, practice, or procedure with generally applicable impact." *Soutter*, 307 F.R.D. at 205–06; *accord Brooks*, 743 F. Supp. 3d at 646. Finally, the Class Plaintiffs' choice to seek statutory damages, rather than actual damages, obviates any need for individualized damage inquiries. *See Brooks*, 743 F. Supp. 3d at 651; *McIntyre*, 336 F.R.D. at 439; *Feliciano*, 332 F.R.D. at 106–07.

**B.      A Class Action Is Superior to Other Available Means of Adjudication.**

Finally, Class Plaintiffs have also shown that litigating this case as a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). To evaluate superiority, courts consider four factors: (i) class members' interests in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already begun by or against class members; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)–(D).

Here, each of these factors supports certification. First, individual members of the Class do not have an interest in controlling the prosecution of separate actions. *See* 7 NEWBERG ON CLASS ACTIONS § 21:4 (6th ed. 2022) ("Absent a class suit, many FCRA violations would remain un-remedied."). Second, Plaintiffs' counsel is aware of only a handful of individual actions against TransUnion related to its DMF-matching procedures, and "[t]o the extent any individual does wish to retain control, or seek actual damages, the opt-out mechanism will be available." *Soutter*, 307 F.R.D. at 218. Third, because "TransUnion is alleged to have violated the consumer rights of tens

16

of thousands of class members spread across the entire nation," it is "far more desirable and efficient to resolve these tens of thousands of cases in one class action lawsuit than to have scattered individual lawsuits across the country, which will inevitably fail to address the entire claims of the entire class." *Brooks*, 743 F. Supp. 3d at 651.  Finally, given the number of common issues in this case, there are no foreseeable case-management concerns.  *See McIntyre*, 336 F.R.D. at 439.

## IV.    TRANSUNION'S ANTICIPATED COUNTERARGUMENTS WILL FAIL.

Through the course of discovery, it has become apparent that TransUnion intends to oppose class certification by arguing that the Class is non-ascertainable and that certain of its affirmative defenses will present individualized issues that defeat predominance or present other issues. Through two of its expert witnesses, David Alfaro and Brad Carpenter,[34] TransUnion has advanced a panoply of arguments, each of which fails.

### A.    TransUnion's Hypothetical Claims About Businesses, Test Names, and "Synthetic Identities" in the Jaffe Proposed Class Will Fail to Defeat Certification.

TransUnion may argue, for example, that the Class cannot be ascertained because Mr. Jaffe has allegedly failed to filter out and exclude from the Jaffe Proposed Class 100% of the "non-natural persons" whose information was included in TransUnion Dataset.  In the Alfaro Report, for example, Mr. Alfaro ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[34] *See* Ex. 19, Expert Report of David Alfaro, Nov. 15, 2024 ("Alfaro Rpt."); Ex. 20, Amended Expert Report of Brad Carpenter, Dec. 20, 2024 ("Carpenter Opening Rpt."); Ex. 21, Reply Expert Report of Brad Carpenter, Mar. 14, 2025 ("Carpenter Reply Rpt.").

[REDACTED]

[REDACTED]

[REDACTED]

Notably, nowhere in the reports of either Mr. Alfaro or Mr. Carpenter does TransUnion try to quantify the presence of supposed non-natural persons on Mr. Jaffe's proposed class list,[37] nor does TransUnion offer a *single* example of a "synthetic identity" that exists within the Jaffe Proposed Class.  Instead, TransUnion relies entirely on a series of general opinions offered by Mr. Carpenter, who opines merely [REDACTED]

[REDACTED] Yet despite this complete absence of evidence in favor of its (implied) theory that the Jaffe Proposed Class is pervaded by these "synthetic identities," Plaintiffs expect TransUnion to argue that the hypothetical presence of potentially fraudulent identities in its own data precludes the Court from certifying the Class.  This is nonsense.

To begin with, the wholly speculative nature of TransUnion's claims about "non-natural persons" and "synthetic identities" would, standing alone, be enough for this Court to reject them. *See Cmty. Bank of N. Va.*, 795 F.3d at 396–97 (rejecting as "mired in speculation" defendant's claim that some proposed class members may have declared bankruptcy, because defendant had

---

[35] Ex. 19, Alfaro Report, ¶¶ 33–34.

[36] [REDACTED]

[REDACTED]

[37] In connection with his Reply Report, Mr. Jaffe manually reviewed the credit inquiries associated with two sets of 400 randomly chosen consumers from within the Jaffe Proposed Class.  *See* Ex. 18, Jaffe Reply Rpt. ¶¶ 300–302.  TransUnion has not identified any non-natural persons on either sample, which suggests that few, if any, non-natural persons remain in the Jaffe Proposed Class.

[38] [REDACTED]

18

"adduced no evidence whatsoever suggesting that many—or even any—members of the class are actually embroiled in bankruptcy proceedings"); *see also Soutter*, 307 F.R.D. at 198 (rejecting argument that class was not ascertainable in part because defendant had "constructed little more than a paper obstacle, offering no evidence that such a hypothetical situation even exists for this class"). But even if there were some reason to believe that the existence of "non-natural persons" and "synthetic identities" were a pervasive issue in the Jaffe Proposed Class, as opposed to an incidental one, there would still remain other options available to help identify members of the Class and fill in "gaps in the evidence," *Hargrove*, 974 F.3d at 480–81, including (i) additional due diligence conducted by a claims administrator,[39] *see Byrd*, 784 F.3d at 170–71 (noting that "[t]here will always be some level of inquiry required to verify that a person is a member of a class");[40] and (ii) class-member affidavits, which can be especially useful where, as here, information produced in discovery has already "define[d] a limited set of potential claimants." *City Select*, 867 F.3d at 442 (reversing denial of certification and noting that the use of affidavits to identify class members within defendant's potentially overinclusive database records did "not necessarily require individualized fact-finding that would be administratively infeasible or a violation of [defendant's] due process rights"); *Byrd*, 784 F.3d at 170–71 (plaintiffs' proposal to use affida-

---

[39] *See* Ex. 29, Proposal from JND Legal Administration, at 2 ("In all of JND's administration projects, our specialized data team performs a verification and standardization process before uploading data into our proprietary project database in order to ensure that all data is in the same format and complies with postal guidelines for effective notice mailing. Additionally, we also often analyze the data to adhere to special requirements dictated by the matter. We understand that this engagement will require additional review to ensure that the class list only contains natural persons.").

[40] *See also* Brief of Claims Administrators as *Amici Curiae* in Support of Neither Party, *Lab. Corp. of Am. Holdings v. Davis*, No. 24-304 (U.S. argued Apr. 29, 2025), 2025 WL 880773, at *15 ("[C]laims administrators have developed increasingly sophisticated processes for evaluating claims accurately and efficiently. . . . Robust claims verification processes, conducted according to plans approved by district courts, can be an efficient means for identifying individuals with the proof of injury courts deem necessary to recover damages.").

vits to identify the "household members" of class members was "neither administratively infeasible nor a violation of Defendants' due process rights" because plaintiffs were "not relying solely on unverified affidavits").[41]  Any attempt by TransUnion to argue that the hypothetical presence of non-persons in the Class is somehow a violation of the company's due-process rights is also doomed to failure for the additional reason that any eventual jury verdict finding TransUnion liable will award damages on a *per-Class-member* basis, rather than in one lump sum.[42]

### B.    TransUnion's Hypothetical Claims About "Collections" Inquiries in the Jaffe Proposed Class Will Fail to Defeat Certification.

TransUnion may also attempt to defeat ascertainability or predominance by claiming that Mr. Jaffe's algorithmic method for identifying members of the Jaffe Proposed Class failed to filter out 100% of the credit inquiries in the TransUnion Dataset that may have been made for the purpose of "collections," rather than in connection with a credit transaction.  During fact discovery, Plaintiffs requested the information necessary to fully exclude collections requests,[43] and in response, TransUnion stated ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████.[44]  Nevertheless, TransUnion then proceeded to serve the Alfaro Report, in which Mr. Alfaro ███████████████████████████

---

[41] Alternatively (or in addition), the Court may choose to direct TransUnion to work with Plaintiffs' data-science expert, Mr. Jaffe, to identify other information in TransUnion's internal databases that can be analyzed to filter and ascertain Class members.  *See, e.g.*, *Brooks v. Trans Union, LLC*, No. 22-cv-00048-KSM, ECF No. 123 (E.D. Pa. Aug. 19, 2024), at 3 ("TransUnion agrees to work cooperatively and jointly with Plaintiff and Mr. Jaffe to develop a workable process to extract relevant data from TransUnion's systems in order to identify members of the certified class.").

[42] *See supra* note 32 and accompanying text.

[43] *See* Ex. 23, Plaintiffs' 2d Set of RFPs, ¶ 12 (requesting the production of "documents sufficient to show all subscriber codes and/or subscriber names that are or may be associated with (i) collections, (ii) credit monitoring, or (iii) direct-to-consumer inquiries for all subscribers to whom [TransUnion] provided Deceased Information during the Class Period").

[44] ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████[45]

As an initial matter, this criticism is based on little more than Mr. Alfaro's speculation that

████████████████████████████████████████████████████████

███████████  Again, Mr. Alfaro makes no effort to quantify the prevalence of this issue, and he ignores the steps that Mr. Jaffe took to filter out these subscribers.  Nor has TransUnion produced any evidence indicating that any Class member's credit inquiry was made for a collections purpose. Moreover, to the extent TransUnion intends to argue (by implication or otherwise) that the Class is non-ascertainable because *its own computer systems* cannot adequately identify credit inquiries that were made for collections purposes, similar arguments have been repeatedly rejected. "[W]here a defendant's lack of records makes it more difficult to ascertain members of an otherwise objectively verifiable class, the individuals who make up that class should not bear the cost of the defendant's faulty record keeping." *Kelly*, 47 F.4th at 223 (cleaned up); *see, e.g.*, *Hargrove*, 974 F.3d at 481 (rejecting defendant's "audacious[]" argument that "its own driver rosters should be disregarded because it is unclear that they are accurate"); *Brooks*, 743 F. Supp. 3d at 649 n.34 (noting that "matching records with individual consumers is precisely what Trans Union does to create the credit reports it sells"); *Soutter*, 307 F.R.D. at 197–98 (E.D. Va. 2015) ("Equifax's very business model includes gathering and distilling information from a wide variety of sources in order to glean insights about individuals.  The irony here presumably is not lost on Equifax, and certainly is not lost on the Court.").[46]  TransUnion should not be allowed to use its paid expert to

---

[45] ████████████████████████████████████████

[46] Moreover, even if it were viable for TransUnion to oppose ascertainability by pointing to supposed inadequacies in its own database software, the underlying factual claim would remain highly questionable.

speculate that its own records *might* indicate something, while simultaneously refusing to produce the underlying records.  *See, e.g.*, *Brooks*, 743 F. Supp. 3d at 638–40 (rejecting argument that plaintiff "failed to meet his burden" on ascertainability because plaintiff's data-science expert had not "provided the exact query that could be used to search [TransUnion's system] for the relevant logs"; noting that expert "was never given the opportunity to analyze data that TransUnion failed to produce"; and concluding that TransUnion's argument was "akin to faulting Plaintiff for failing to solve a math problem that has never been presented to him"); *cf. Hargrove*, 974 F.3d at 481 n.8 ("On remand, . . . the District Court is of course free to reopen discovery to address gaps in the record, especially given that [defendant] may have more documents that cover a wider timespan.").

**C.    Common Issues Will Predominate at Trial, Notwithstanding TransUnion's Vague and Unsubstantiated Claims of Class-Member "Fraud."**

Finally, TransUnion may attempt to oppose class certification by arguing that certain of its affirmative defenses will require individualized inquiries that defeat predominance.  In particular, TransUnion appears likely to assert an "unclean hands"[47] defense against an undefined subset of Class members, whom TransUnion plans to accuse of having committed some sort of "fraud" or

---

Under the FCRA, consumer-reporting agencies are forbidden from furnishing consumer reports for any purpose other than one of certain specifically enumerated "permissible purposes."  *See, e.g.*, 15 U.S.C. § 1681b(a)(3)(A) (authorizing the furnishing of a consumer report in connection with "the extension of credit to, or review or collection of an account of, the consumer").  It beggars belief that a national CRA like TransUnion would fail to keep detailed records of its subscribers' claimed permissible purposes; and in fact, ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

[47] *See* ECF No. 62 at 23 ("Plaintiffs' claims are barred . . . by the doctrines of estoppel, release, waiver, illegality and/or unclean hands").  Because the Class Plaintiffs will seek only damages, however, rather than any sort of equitable relief, "the unclean hands doctrine is not applicable."  *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 756 n.10 (3d Cir. 1990); *accord Cole v. Am. Fam. Mut. Ins. Co.*, 410 F. Supp. 2d 1020, 1025 (D. Kan. 2006) (noting the absence of any "authority for the proposition that the unclean hands doctrine applies to claims under the FCRA").  And even the related doctrine of *in pari delicto*, which applies to claims of law (but which TransUnion has not pled), requires a level of culpability far greater than TransUnion could ever hope to prove here.  *See Pinter v. Dahl*, 486 U.S. 622, 636 (1988).

misconduct in connection with the consumer reports in which TransUnion falsely called them "DECEASED." These arguments will fail.

To begin with, TransUnion has never presented a viable factual theory for how the actions of *any* Class member might have constituted fraud against TransUnion. For example, TransUnion has made vague accusations of wrongdoing against Class Plaintiff Jose Alberto Aleman Lopez based on an allegation that ███████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████ ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████ ██████████████████████████████████████████████████████████

████████████ ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████[51] But the FCRA obligates CRAs like *TransUnion*, not consumers like Mr. Aleman Lopez, to "follow reasonable procedures to assure maximum possible accuracy"—and here, if TransUnion had designed its automated procedures either (i) to consider ITIN information when setting a consumer's File SSN, or (ii) to consider *all* of the identifying information on a DMF entry before returning a hit, TransUnion would have avoided falsely declaring that Mr. Aleman Lopez was "DECEASED" based on an obviously false match to someone named "Helen Klass," who was born in 1888 and died in 1978.[52]

---

[48] █████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████

[49] ████████████████████

[50] ████████████████████████████

[51] ██████████████████████████████████

[52] *See* Ex. 26, CHRISTIAN_TU_0000224 at -278.

TransUnion also plans to lodge similarly vague and baseless accusations of fraud against a broad swath of Class members who are associated with at least one credit inquiry in which the Input SSN was identical to the consumer's incorrect File SSN.[53]  TransUnion's theory, it seems, is that all of these consumers must have been attempting to defraud the company by providing dead peoples' SSNs to creditors.  Yet TransUnion has never been able to point to a *single* example of a specific consumer whom it can credibly accuse of "fraud," much less to any individualized evidence that it might use to surmount the much more likely explanation:  that the creditors who provided these inaccurate Input SSNs did so by mistake, or from inaccurate "enriched" SSN data obtained from third-party sources.[54]  In fact, the *only* evidence that TransUnion has offered to date has been a series of misleading claims from one of its experts, Mr. Carpenter, alleging that several hundred members of the Jaffe Proposed Class ███████████████████████████████████ ████████████████████████████████████████████[55]  At his deposition, however, Mr. Carpenter admitted that ████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████[56]  In the absence of any non-speculative evidence showing that some large percentage of Class members were committing "fraud"—and especially in light of the fact that TransUnion will *bear the burden of proof* on its affirmative defenses—these

---

[53] Notably, any consumers for whom *all* consumer-report requests listed in the TransUnion Dataset have this characteristic (*i.e.*, Input SSN = File SSN) have already been excluded from the Class.  *See supra* p. 9 (defining the Class to include only those consumers who are associated with at least one credit inquiry that "did not include an [Input SSN] that was a nine-digit match to the deceased person's [SSN]").

[54] Notably, TransUnion itself offers "identity enrichment" products, including "TruLookup Identity Prefill," which purports to allow its business customers to "[p]refill [consumer] data for a user-friendly process that helps minimize friction and avoid abandonment." *See* https://www.transunion.com/solution/trulookup/identity-enrichment/identity-prefill (last visited May 21, 2025).

[55] ████████████████████████████████

[56] ████████████████████████████████████

claims will fail to defeat predominance. *See, e.g.*, *McIntyre*, 336 F.R.D. at 438 (rejecting defendant's anti-predominance arguments based on "[h]ypothetical individualized errors"); *Norman v. Trans Union, LLC*, 669 F. Supp. 3d 351, 384 (E.D. Pa. 2023) (predominance met where "TransUnion has not convincingly shown that the use of credit repair organizations is as prevalent in this class as it suggests").

Indeed, far from weighing against certification, these and other claims by TransUnion's experts, taken as a whole, amount to an argument that the company's procedures for declaring consumers as deceased were reasonable because they helped to detect fraud.[57]  But there is no "fraud prevention" exception to the FCRA's "maximum possible accuracy" requirement, and in any event, to the extent this will be TransUnion's defense at trial, it presents a classwide issue.

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion, certify the Class, appoint the Class Plaintiffs to serve as Class Representatives, and appoint Berger Montague PC and Kelly Guzzo, PLC as Class Counsel.

Dated:  May 30, 2025

Respectfully submitted,

**BERGER MONTAGUE PC**

By*:    /s/ E. Michelle Drake*
Shanon J. Carson (Pa. I.D. No. 85957)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: 215-875-4656
scarson@bm.net

---

[57] *See* Ex. 20, Carpenter Opening Rpt., ¶ 81 ███████████████████ ███████████████████ ██████████████ Ex. 27, Carpenter Dep. at 183:14–185:12; Ex. 28, Expert Report of Troy Kubes at 20 ███████████ ████████

E. Michelle Drake (*pro hac vice*)
Joseph C. Hashmall (*pro hac vice)*
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Tel.: 612-594-5999
emdrake@bm.net
jhashmall@bm.net

Zachary M. Vaughan (*pro hac vice*)
1001 G Street NW, Suite 400 East
Washington, DC 20001
Tel: 215-875-4602
zvaughan@bm.net

**KELLY GUZZO, PLC**

Kristi C. Kelly (*pro hac vice*)
Andrew J. Guzzo (*pro hac vice*)
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Tel.: 703-424-7572
kkelly@kellyguzzo.com
aguzzo@kellyguzzo.com

*Counsel for Plaintiffs*

26

## CERTIFICATE OF SERVICE

I hereby certify that on this day I caused a copy of the foregoing to be electronically filed with the Court via the CM/ECF system.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing systems.  Parties may access the filing through the Court's CM/ECF System.


Dated: May 30, 2025                          /s/E. Michelle Drake
                                                        E. Michelle Drake