**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RICKY CHRISTIAN, LESLIE RICHARDSON, JOSE ALBERTO ALEMAN LOPEZ, MICHELLE FYDA, MADISON ELLIOTT, and JENNIFER APARICIO, *for themselves and all similarly situated individuals*,<br><br>Plaintiffs,<br><br>v.<br><br>TRANS UNION, LLC,<br><br>Defendant. | No. 2:22-cv-2253-JDW |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

# TABLE OF CONTENTS

Page


BACKGROUND ..... 3

A. Factual Background ..... 3

B. Procedural History ..... 4

SETTLEMENT TERMS ..... 6

A. The Settlement Classes ..... 6

B. Monetary Consideration ..... 7

C. Injunctive Relief ..... 8

D. Class Action Fairness Notice ..... 8

E. Attorneys' Fees, Costs, and Service Awards ..... 9

F. Release of Claims ..... 9

G. Notice Plan and Opt-Outs ..... 10

ARGUMENT ..... 11

A. Preliminary Approval and Class Certification Standards ..... 11

B. The Settlement Class Meets the Certification Elements ..... 12

i. The Settlement Class Satisfies Rule 23(a) ..... 12

1. Numerosity ..... 12

2. Commonality ..... 13

3. Typicality ..... 14

4. Adequacy of Representation ..... 15

ii. The Settlement Classes Satisfy Rule 23(b)(3) and 23(b)(2) ..... 16

1. Ascertainability, Predominance, and Superiority [Rule 23(b)(3)] ..... 16

2. TransUnion Acted on Grounds that Apply Generally to the Injunctive Relief Settlement Class [Rule 23(b)(2)] ..... 17

C. The Settlement Satisfies the Requirements of Rule 23(e)(2) ..... 17

i. Plaintiffs and Class Counsel Have Adequately Represented the Classes. ..... 18

ii. Negotiations Were at Arm's Length and Involved Respected Mediators. ..... 19

iii. The Relief Provided to the Classes Is Adequate. ..... 20

iv. The Settlement Treats Settlement Class Members Equitably Relative to Each Other. ..... 22

D. The Proposed Notice and Notice Plan Satisfy Rule 23 .......... 23
CONCLUSION .......... 24

This case arises from an alleged violation of § 1681e(b) of the Fair Credit Reporting Act, which requires consumer reporting agencies like TransUnion to "follow reasonable procedures to assure maximum possible accuracy" of the information that they report to consumers' potential creditors. 15 U.S.C. § 1681e(b). Specifically, Plaintiffs have alleged that, during the Class Period, TransUnion failed to follow reasonable procedures in connection with consumer reports in which it reported that living consumers were "deceased," based solely on a match between the "primary" SSN listed in the consumer's TransUnion file with the SSN listed for a deceased person on the U.S. Social Security Administration's Death Master File (the "DMF").

Following more than four years of contested litigation, including substantial discovery and an extensively briefed motion for class certification, Plaintiffs and TransUnion engaged in multiple arms'-length settlement negotiations and mediations before the Honorable Douglas E. Arpert (Ret.). Earlier settlement discussions had also been conducted before Rodney A. Max, Esq., a private mediator with a national reputation in complex class-action litigation (Settlement Agreement § 1.3), and the parties' prior unsuccessful efforts before Mr. Max informed the negotiations that culminated in the Settlement Agreement. As a result of those negotiations, the parties have entered into a Stipulation and Agreement of Settlement (the "Settlement Agreement"), which resolves the claims asserted in this Action on a class-wide basis. The Settlement Agreement provides two classes of consumers with impressive monetary and injunctive relief.

First, the Settlement Agreement creates a Common Fund with a maximum value of $25,000,000, from which (i) members of the Reported Deceased Monetary Damages Class who satisfy the criteria for the "Autopay Category"[1] will each receive a payment of approximately $141

[1] Capitalized terms have the meanings given to them in the Settlement Agreement. Class Members in the Autopay Category are those who satisfy at least one of the following criteria within the class period: (1) the consumer submitted at least one credit dispute to TransUnion regarding their

without the need to submit a claim form; and (ii) members of the Claims-Made Category[2] who submit a valid claim will receive an equal payment. Members of both categories will also be able to submit claims for additional payments of up to $10,000 for documented credit denials. (Agreement §§ 5.1–5.4.)

Second, for the benefit of the Injunctive Relief Settlement Class, which consists of all consumers whose name or date of birth do not match the DMF entry with which they were matched and who have no other indicators of their death, TransUnion has agreed (i) to maintain, for a period of at least five years, the materially enhanced DMF matching procedures that it implemented in or about October 2023 and June 2024, which require multi-factor verification before any "SUBJECT IS DECEASED" indicator is included in a consumer report; and (ii) that any future modifications must be equally or more protective of consumers. (Agreement § 5.5.)

This settlement represents an excellent result for class members. The Fair Credit Reporting Act provides for statutory damages between $100 and $1,000, actual damages, and potentially punitive damages. *See* 15 U.S.C. § 1681n. In the class-action context, settlements resulting in payments that exceed the statutory minimum, particularly those involving large classes, are laudable. *See Gibbs v. Centerplate, Inc.*, 2018 WL 6983498, at *8 (M.D. Fla. Dec. 28, 2018) (characterizing a recovery of $100 per class member in an FCRA case as an "excellent result").

---

deceased reporting; *OR* (2) (a) the consumer (i) had an Input SSN associated with a credit inquiry was one or two digits different from the File SSN maintained by TransUnion and the Input SSN was valid, (ii) has a current SSN no longer matches the historical File SSN and the consumer was never associated with an inquiry for which the Input SSN matched the File SSN, (iii) the consumer's Input SSN was a valid ITIN or non-valid SSN (i.e., was blank or only four digits long, or otherwise failed to qualify as a valid SSN) or (iv) had an Input SSN across all inquiries that was a valid SSN and did not match the then-existing File SSN, AND (b) the consumer had activity on at least one tradeline after a qualifying inquiry. (Settlement Agreement § 2.27.)

[2] Claims-Made Category members are all those who are in the Reported Deceased Monetary Damages Class who do not satisfy the Autopay Category criteria. (*Id.* § 2.28.)

Each participating member of the Reported Deceased Monetary Damages Class will receive a check that *exceeds* the minimum amount of statutory damages available to them under the FCRA, and those who can verify a credit denial may receive up to $10,000—while at the same time avoiding the risk of a denial of class certification or a loss at trial on the merits of their claims.

Plaintiffs and TransUnion now seek preliminary approval of their proposed class-action settlement. The parties request that the Court preliminarily certify the Reported Deceased Monetary Damages Class under Rule 23(b)(3) and the Injunctive Relief Settlement Class under Rule 23(b)(2); approve the proposed Class Notices; appoint Class Counsel and the proposed Settlement Administrator; and schedule a Final Approval Hearing at the Court's earliest convenience, but no sooner than ninety days after the mailing of Notice to the Settlement Classes, as required by Rule 23(e) and the Settlement Agreement. *See* Agreement § 1.27.

For these reasons, and as further explained below, the proposed class-action settlement is reasonable, fair, and adequate, and the Court should preliminarily approve it.

## BACKGROUND

### A. Factual Background

The Fair Credit Reporting Act ("FCRA") requires consumer reporting agencies like TransUnion to "follow reasonable procedures to assure maximum possible accuracy" of the information they report to consumers' potential creditors. 15 U.S.C. § 1681e(b). In this case, Plaintiffs have alleged that throughout the Class Period (May 17, 2020 through June 30, 2024), TransUnion employed a single-identifier matching procedure (the "DMF Matching Procedure") to decide whether to report a consumer as "DECEASED" based on a purported match to a deceased person listed on the U.S. Social Security Administration's Death Master File (the "DMF"). Although the DMF provides names, dates of birth, and dates of death alongside each decedent's Social Security number, TransUnion's algorithm compared only the deceased person's SSN

against the consumer's "primary" SSN, which was determined using TransUnion's SSN-ordering algorithm based on information in the consumer's TransUnion file. If those two numbers matched, TransUnion would (i) refuse to issue a credit score for the consumer, and (ii) add a response code to its consumer report that translated to "FILE NOT SCORED BECAUSE SUBJECT IS DECEASED." TransUnion's procedure ignored the name and date-of-birth information on the DMF entry even though that information was already present in the consumer's file. The result was that, throughout the Class Period, TransUnion reported living consumers as "DECEASED," and refused to issue them credit scores, even where the consumer's name and date of birth were both different from the name and date of birth of the deceased person whom TransUnion matched to the consumer. This often-produced absurd results, such as consumer reports that marked consumers as "DECEASED" based on DMF matches to people who had died years or decades before the consumers were born.

For each of the Plaintiffs, TransUnion sold a consumer report bearing the "FILE NOT SCORED BECAUSE SUBJECT IS DECEASED" message code based on facially false and illogical "matches" to unrelated decedents on the DMF. For example: Ricky Christian (b. 1958) was matched to Thurman Garner (b. 1903, d. 1976); Jose Alberto Aleman Lopez (b. 1983) was matched to Helen Klass (b. 1888, d. 1978); Michelle Fyda (b. 1997) was matched to Homer Earl (b. 1899, d. 1966); Madison Elliott (b. 1999) was matched to Ned Linn (b. 1880, d. 1968); and Jennifer Aparicio (b. 1990) was matched to Eleanor Matranga (b. 1913, d. 1981).

Based on this unreasonable matching procedure, Plaintiffs brought a class claim on behalf of themselves and similarly situated consumers under § 1681e(b) of the Fair Credit Reporting Act, which is the subject of the proposed settlement.

**B. Procedural History**

On June 8, 2022, Plaintiffs filed suit against TransUnion, asserting violations of the FCRA.

(ECF No. 1.) The case was initially assigned to the Honorable Mitchell S. Goldberg. (ECF No. 9.) Plaintiffs filed their Second Amended Complaint on February 15, 2023 (ECF No. 35). TransUnion answered on March 8, 2023 (ECF No. 39), and the parties then engaged in extensive discovery.

Fact discovery opened in late 2022 and included the production by TransUnion of over 800,000 pages of documents, in addition to more than 130 million rows of structured data. Fact depositions were similarly extensive: TransUnion deposed each named Plaintiff, and Plaintiffs took ten 30(b)(1) depositions of TransUnion personnel, in addition to a 30(b)(6) deposition of TransUnion itself. This was followed by expert discovery, in which Plaintiffs offered reports from five expert witnesses (Jonathan Jaffe, Craig Knoblock, Evan Hendricks, Adam Levitin, and Matt O'Neill) and TransUnion offered reports from three experts of its own (David Alfaro, Brad Carpenter, and Troy Kubes)—all of whom then sat for depositions.

During the discovery process, the parties also participated in sustained, arms'-length settlement negotiations before two respected neutrals. In late 2023 and early 2024, the parties held multiple mediation sessions with Rodney A. Max, Esq., a private mediator with a national reputation in complex class-action litigation (*see* Settlement Agreement § 1.3). When those efforts did not produce a resolution, the parties resumed litigation, completing the fact-discovery process, expert discovery, and full briefing on class certification.

On May 30, 2025, Plaintiffs filed their Motion for Class Certification (ECF No. 79), which TransUnion opposed on July 11, 2025 (ECF No. 89). Plaintiffs replied on August 15, 2025 (ECF No. 93). Thereafter, during the spring and summer of 2026, the parties re-engaged in the mediation process, this time with Hon. Douglas E. Arpert (Ret.). The work of each of these two mediators (Mr. Max and Judge Arpert) informed the negotiations that ultimately culminated in the Settlement Agreement.

On October 10, 2025, the case was reassigned to this Court (ECF No. 101), and on July 10, 2026, after the parties informed the Court of their settlement, the Court denied Plaintiffs' Motion for Class Certification as moot (ECF No. 102). Following additional arms'-length negotiations with continued mediator assistance, the parties executed the Stipulation and Agreement of Settlement that is the subject of the present Motion.

## SETTLEMENT TERMS

### A. The Settlement Classes

The parties have agreed to conditionally certify two settlement classes. The Reported Deceased Monetary Damages Class, which Plaintiffs move to certify under Rule 23(b)(3), consists of:

> All natural persons ("Consumers") residing in the United States who, during the period from May 17, 2020 through June 30, 2024, were the subject of one or more consumer reports issued by TransUnion that met all of the following conditions:
>
> (i) TransUnion sold the consumer report to a third party for a purpose other than collections;
>
> (ii) TransUnion reported that the Consumer was deceased based on a match between the Consumer's then-existing TransUnion "file" Social Security number ("File SSN") and the Social Security number of a deceased person listed on the Social Security Administration's Death Master File ("DMF");
>
> (iii) the Consumer's name was different from the deceased person's name;
>
> (iv) the Consumer's date of birth was different from the deceased person's date of birth;
>
> (v) the consumer report request that TransUnion received from the third party did not include an "input" Social Security number ("Input SSN") that was a nine-digit match to the deceased person's Social Security number (i.e., the value of the Input SSN that TransUnion received was different, or the field was blank);
>
> (vi) as of the date on which TransUnion pulled the data that has been provided to Plaintiffs, the Consumer's then-current TransUnion file did not indicate that a creditor has reported the Consumer as deceased or that TransUnion has recorded a deceased date for the Consumer based on a death certificate or other documentation; and
>
> (vii) TransUnion did not report a credit score for the Consumer.

(Settlement Agreement § 2.25.)

The Injunctive Relief Settlement Class, which Plaintiffs move to certify under Rule

23(b)(2), consists of all persons who were the subject of a TransUnion credit report for a non-collections purpose between May 17, 2017 and July 1, 2029 whose file SSN matches a SSN on the DMF, but whose name and/or date of birth do not match the underlying DMF entry, and who are not the subject of a second-furnisher deceased report, a report from the consumer's representative, or a report from another consumer reporting agency confirming that the consumer is deceased. (*Id.* § 2.29.)

**B. Monetary Consideration**

The Settlement Agreement provides direct monetary payments to consumers affected by the conduct at issue in this Action, together with significant prospective injunctive relief. Plaintiffs achieved the proposed settlement only after TransUnion, which insisted throughout the litigation that its DMF Matching Procedure was reasonable as a matter of law, had retained multiple experts, who all opined at length that class certification was unwarranted. Following more than four years of contested litigation and the exchange of more than 800,000 pages of discovery and 130 million rows of structured data, the parties participated in multiple mediation sessions before Judge Arpert, culminating in the Settlement Agreement now before the Court.

The relief afforded by the Settlement Agreement is substantial. TransUnion will contribute up to $25,000,000 into the Common Fund, including (i) $18,800,286 to provide automatic payments of $141 to every Autopay Category Class Member and to make provision for the maximum allowed attorneys' fees, costs, service awards, and capped administration expenses; and (ii) up to $6,199,714 in additional funds sufficient to pay $141 *pro rata* payments to every Claims-Made Category Member who submits a valid claim—plus, for members of both the Autopay Category and the Claims-Made Category, documented Actual Damages Payments of up to $5,000 (mortgage denial), $1,500 (auto loan denial), and $1,000 (line of credit, personal loan, or credit card denial), subject to a per-Consumer cap of $10,000. (Settlement Agreement §§ 5.1–5.3.) After

the deduction of all Court-approved attorneys' fees, costs, expenses, service awards, and capped administration costs (each to be sought from the Common Fund, *id.* §§ 5.4, 6.1–6.2), and a redistribution of any uncashed or unaccessed residuals (or, to the extent redistribution to the Settlement Classes proves infeasible, distribution to a *cy pres* recipient approved by the Court) in accordance with Section 5.6 of the Agreement, every Reported Deceased Monetary Damages Class Member will be entitled to either an automatic or a claim-supported payment. (*Id.* § 5.4(d).)

**C. Injunctive Relief**

As part of the Settlement Agreement, and for the express benefit of the Injunctive Relief Settlement Class under Rule 23(b)(2), TransUnion has agreed to maintain for a period of at least five years the enhanced DMF Matching Procedures that it implemented in or about October 2023 and on June 30, 2024 in response to this litigation. (Settlement Agreement § 5.5.) These procedures include:

- *October 2023 Logic.* Beginning in or about October 2023, following the filing of this litigation, TransUnion enhanced its logic so that, when a single furnisher reports that a consumer associated with a specific tradeline is deceased, TransUnion will not report that the consumer is deceased to a subscriber unless and until it receives corroborating evidence of the consumer's death, such as confirmation from a second furnisher, a sufficient match to the DMF, information from the consumer's representative, or information from another CRA. (*Id.* § 5.5(a).)

- *June 2024 Logic.* On or about June 30, 2024, TransUnion implemented enhanced matching logic with respect to the DMF itself. Where a score is requested, TransUnion's system applies its subject-selection rules to identify the specific subject of the inquiry and then, *before* returning the report, compares the consumer's file SSN, name, and date of birth to the SSN, name, and date of birth on the DMF. No "no-score" message is returned unless there is an exact match of SSNs *and* a sufficient match for the other two indicatives. (*Id.* § 5.5(b).)

In the Settlement Agreement, TransUnion further agrees that any modification to these procedures during the five-year period must be equally or more protective of consumers. (*Id.* §§ 5.6–5.7.)

**D. Class Action Fairness Notice**

TransUnion will provide notice of the proposed settlement under the Class Action Fairness

Act of 2005, 28 U.S.C. § 1715 ("CAFA"). The CAFA Notice will be sent to the Attorney General of the United States and to the attorneys general of all states, the District of Columbia, and all U.S. territories. (Settlement Agreement § 8.2(f).)

**E. Attorneys' Fees, Costs, and Service Awards**

Class Counsel will apply to the Court for approval of (i) Service Awards of up to $10,000 for each of the six named Plaintiffs, to be paid from the Common Fund (Settlement Agreement § 6.2); (ii) attorneys' fees in an amount not to exceed $9,981,000 (39.9% of the maximum value of the Common Fund), plus out-of-pocket expenses not to exceed $625,000 and administration costs not to exceed $905,000 (*id.* § 6.3); and (iii) in each case, any portion of those requests that the Court does not approve will be redistributed as an additional *pro rata* payment to Class Members. (*Id.*). The Settlement is not contingent in any manner on approval of the requested fees.

**F. Release of Claims**

In exchange for the foregoing consideration, the Settlement Agreement's release is narrowly tailored to the claims actually alleged in this Action and for which the specific releasing class member is receiving consideration. For members of the Reported Deceased Monetary Damages Class, the release covers "any and all claims against the Released Parties, including claims for actual damages, arising from or related to TransUnion's inaccurate reporting of class members as deceased between May 17, 2020 and June 30, 2024." (Settlement Agreement § 2.18.) For members of the Injunctive Relief Settlement Class, the release covers "all claims for injunctive relief arising from or related to TransUnion's inaccurate reporting of class members as deceased between July 1, 2017 and June 30, 2024." (*Id.*) Injunctive Relief Class Members can thus bring individual claims for monetary damages, and all class members preserve claims unrelated to deceased reporting, such as other inaccuracies on their TransUnion credit reports.

**G. Notice Plan and Opt-Outs**

Notice will be effectuated by both regular mail and electronic mail to the Settlement Classes. Within 14 days of entry of the Preliminary Approval Order, TransUnion will provide the Settlement Administrator with a class list that includes each class member's name, last-known primary mailing address, and month and year of date of birth, as found in TransUnion's records. (*Id.* § 8.2(a).) Within 30 days after entry of the Preliminary Approval Order, the Settlement Administrator will send the Notice (which will use the forms attached as Exhibits B.1, B.2, and B.3 to the Settlement Agreement) via mail and electronic mail to every member of the Reported Deceased Monetary Damages Class. (*Id.* § 8.2(b).)

For mailed Notice, the Settlement Administrator will first run the class list against the U.S. Postal Service's National Change of Address System, send the Notice by U.S. Mail (postage prepaid and using forwarding and change-of-address service), and, for up to 45 days following the original mailing, re-mail the Notice to any recipient shown by USPS or other reasonable skip-trace to have moved. (*Id.*) The electronic-mail Notice will include a link to the online Claim Forms on the Settlement Website, and the mailed Notice will be accompanied by a paper copy of the Claim Forms (one for the Claims-Made Category and one for Actual Damages Claims) with each class member's Claim ID pre-populated. (*Id.* § 8.2(c).) Members of the Autopay Category need only return the payment-election portion of the form. (*Id.* § 5.4(d).) Forty-five days after the Notice mailing, the Settlement Administrator will also send a reminder email, and a reminder postcard by U.S. mail, to all class members who have not yet submitted a Claim Form. (*Id.* § 8.2(h).)

In addition to the above Notices, the Settlement Administrator will create and maintain a Settlement Website, posting the operative complaint, the Class Notice, the Claim Forms, the Settlement Agreement, the Preliminary Approval Order, and procedural information concerning the Final Approval Hearing. (*Id.* § 8.2(g).)

Any Reported Deceased Monetary Damages Class Member who wishes to be excluded from the class must mail a written request for exclusion to the Settlement Administrator, postmarked no later than 60 days after the mailing of Notice. (*Id.* § 9.4.) The Settlement Administrator will supply a list of all such opt-outs to the Parties' counsel no later than seven days before the deadline for filing the motion for final approval. (*Id.*)

## ARGUMENT

### A. Preliminary Approval and Class Certification Standards

Courts in the Third Circuit favor resolution of litigation before trial. *See Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594 (3d Cir. 2010) ("There is a strong presumption in favor of voluntary settlement agreements."). Settlement spares the litigants the uncertainty, delay, and expense of a trial and appeals, while conserving scarce judicial resources. *See id.* at 595; *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.* ("*GM Trucks*"), 55 F.3d 768, 784 (3d Cir. 1995). The Third Circuit has long permitted courts to certify a class solely to carry out a settlement of the case. *See GM Trucks*, 55 F.3d at 784, 793–94. And where a settlement is reached, the district court acts as a fiduciary for the absent class members and may preliminarily certify the proposed settlement classes subject to the same Rule 23 prerequisites that would apply if the action were to be litigated to judgment, plus any additional subsection-specific requirements. *See In re Prudential Ins. Co.*, 148 F.3d 283, 299 (3d Cir. 1998); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997).

Preliminary approval of a class-action settlement may be granted upon a finding that the settlement is fair, reasonable, and adequate. *Ehrheart*, 609 F.3d at 593. To make this assessment, courts consider "whether the proposed agreement arose out of 'serious, informed non-collusive negotiations,' has any 'obvious deficiencies,' 'improperly grant[s] preferential treatment to class representatives or segments of the class,' and 'falls within the range of possible approval.'" *In re*

*Nasdaq Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997) (citing MANUAL FOR COMPLEX LITIGATION § 30.41 (3d ed.)); *accord GM Trucks*, 55 F.3d at 785. If the proposed settlement classes meet the Rule 23(a) prerequisites and one of the Rule 23(b) subsections, and if the settlement falls within the range of possible approval under Rule 23(e)(2), the court should grant preliminary approval and direct notice to the classes. *See GM Trucks*, 55 F.3d at 785; Fed. R. Civ. P. 23(c)(1); Fed. R. Civ. P. 23(e)(1)

Here, the parties have reached a proposed agreement on behalf of the Settlement Classes that provides significant monetary and injunctive relief to address the very harm asserted by Plaintiffs in this case. The Settlement results from extensive, arms'-length negotiations before experienced mediators, and it follows years of litigation and discovery that informed the parries of the strengths and weaknesses of their respective positions. Plaintiffs therefore submit the proposed Settlement as fair, reasonable, and adequate and ask the Court to preliminarily approve it and to direct Notice to the Class Members.

**B. The Settlement Class Meets the Certification Elements**

Plaintiffs previously submitted extensive briefing and supporting expert materials on class certification, which they incorporate here. *See* ECF Nos. 18-19, 79. For the reasons set forth in that briefing, as supplemented below, the Settlement Classes independently satisfy each of the Rule 23(a) prerequisites and the applicable Rule 23(b) requirements.

*i. The Settlement Class Satisfies Rule 23(a)*

*1. Numerosity*

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This requirement is satisfied where, as here, the class is composed of thousands of geographically dispersed members. *See Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 393 (3d Cir. 2015) (numerosity met where class plaintiff

sought to represent "approximately 44,000 borrowers"); *Brooks v. Trans Union LLC*, 743 F. Supp. 3d 622, 646 (E.D. Pa. 2024) (numerosity in class representing thousands of consumers misreported as being in bankruptcy). Impracticability is presumed at forty or more, *see Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001), and courts in this Circuit have no set minimum that must be pled. *See id.*

The numerosity requirement is easily met here. Analysis of the TransUnion Dataset shows that the Reported Deceased Monetary Damages Class contains approximately 492,000 consumers in total (of whom approximately 52,000 are members of the Autopay Category), each of whom was the subject of a report that included similarly false and illogical deceased indicators during the Class Period. *See* Drake Decl. ¶ 7; *see also Brooks*, 743 F. Supp. 3d at 646 (describing comparable volume of affected consumers in another FCRA § 1681e(b) case against TransUnion). Joinder of this many individuals is neither possible nor practical, so the first prong of the certification test has been met. *See Brooks*, 743 F. Supp. 3d at 646.

*2. Commonality*

Rule 23(a)(2) requires a showing that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The "focus of the commonality inquiry is not on the strength of each class member's claims but instead on whether the defendant's conduct was common as to all of the class members." *Cmty. Bank*, 795 F.3d at 397 (cleaned up). In other words, if the defendant uniformly applied a policy or practice to all of the class members, then the commonality requirement is satisfied. *See Brooks*, 743 F. Supp. 3d at 646-47 ("Trans Union's policy applied with equal, laser-like precision to every proposed class member."); *accord Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "'[W]hat matters to class certification . . . is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Cmty. Bank*, 795 F.3d at

398 (emphasis supplied) (quoting *Wal-Mart*, 131 S. Ct. at 2551).

Commonality is easily satisfied here. The Settlement Class Members share at least these questions of law and fact: (i) whether TransUnion's automated DMF Matching Procedure violated its obligation to employ "reasonable procedures to assure maximum possible accuracy" under 15 U.S.C. § 1681e(b); (ii) whether any such violation was negligent or willful; and (iii) the proper amount of damages to be awarded on a class-wide basis. *See Brooks*, 743 F. Supp. 3d at 647; *McIntyre v. RealPage, Inc.*, 336 F.R.D. 422, 434–35 (E.D. Pa. 2020) (finding commonality on similar questions); *Norman v. Trans Union, LLC*, 479 F. Supp. 3d 98, 139–40 (E.D. Pa. 2020) (finding commonality in FCRA case against TransUnion's investigation procedures); *see also Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 207–08 (E.D. Va. 2015) (same). Put simply, there are common questions over the reasonableness of TransUnion's uniformly applied policy and its intent in enacting that policy that are subject to common evidence among all class members, satisfying Rule 23(a)(2).

*3. Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This is a low threshold. *See In re NFL Players Concussion Inj. Litig.*, 821 F.3d 410, 427–28 (3d Cir. 2016) ("Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." (citation omitted)). Typicality is defeated only where the proposed class representatives: (1) advance a different legal theory to the class members; (2) are subject to "'a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation;'" or (3) have interests or incentives that are not sufficiently aligned with the class. *Norman*, 479 F. Supp. 3d at 135-36 (quoting *Marcus v. BMW of N. Am.*, 687 F.3d 583, 598 (3d Cir. 2012)).

Plaintiffs' claims are typical of those of the Settlement Classes. Each named Plaintiff was the subject of a TransUnion consumer report that included the identical "FILE NOT SCORED BECAUSE SUBJECT IS DECEASED" response code, in circumstances where the name and date of birth associated with the matched "file" SSN in fact differed from those of the decedent on the DMF. Classwide proof regarding the reasonableness of TransUnion's procedures, the willfulness of its conduct, and the proper amount of class-wide damages will advance *all* claims of all Settlement Class Members. *See Brooks*, 743 F. Supp. 3d at 647–48; *McIntyre*, 336 F.R.D. at 435–36; *Norman*, 479 F. Supp. 3d at 135–36. And no unique affirmative defense applies to any of the named Plaintiffs that would not also apply to other Settlement Class Members, as the focus is not on individualized errors in their credit reports but a uniform policy that caused all of them to suffer from the same inaccuracy. *Compare McIntyre*, 336 F.R.D. at 438 (rejecting defendant's "hypothetical individualized errors" from one credit report to the next in finding typicality).

*4. Adequacy of Representation*

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The inquiry has two components: "'(a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.'" *Brooks*, 743 F. Supp. 3d at 644 (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007)); *see also Cmty. Bank*, 795 F.3d at 393 ("[T]he primary purpose of the adequacy requirement is to assess whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class."). Both requirements are met here.

First, the named Plaintiffs have no conflicts with absent Settlement Class Members. Each Plaintiff alleges that he or she was the subject of a false deceased report issued by TransUnion as a result of the same automated DMF Matching Procedure that is challenged in this Action, and

each seeks the same statutory and injunctive relief provided by the Settlement Agreement. *See Cortez*, 617 F.3d at 709. Plaintiffs have also actively prosecuted this action, including sitting for depositions, responding to written discovery, reviewing and approving the Settlement Agreement. Drake Decl. ¶ 8; Kelly Decl. ¶ 15.

Second, Class Counsel are exceptionally well qualified to prosecute this case. Berger Montague PC and Kelly Guzzo, PLC together have decades of specialized experience in consumer-protection class actions. *See* Drake Decl. ¶¶ 10–11 & Exhibit 3; Kelly Decl. ¶¶ 8–9.

*ii. The Settlement Classes Satisfy Rule 23(b)(3) and 23(b)(2)*

*1. Ascertainability, Predominance, and Superiority [Rule 23(b)(3)]*

Where, as here, a plaintiff seeks class certification under Rule 23(b)(3),[3] courts in this Circuit require proof that the proposed class is "currently and readily ascertainable based on objective criteria." *City Select Auto Sales Inc. v. BMW Bank of N. Am.*, 867 F.3d 434, 438–39 (3d Cir. 2017). To satisfy this standard, a plaintiff must show, by a preponderance of the evidence, that (i) "the class is defined with reference to objective criteria," and (ii) "there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Id.* at 439; *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 469–70 (3d Cir. 2020); *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). Where, as here, the defendant's records permit a sophisticated algorithmic identification, ascertainability is plainly satisfied. *See Kelly v. RealPage Inc.*, 47 F.4th 202, 213 (3d Cir. 2022).

In addition to ascertainability, a class representative must also show that the common issues of law and fact shared by the (b)(3) settlement class members are "more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouphakeo*,

[3] Plaintiffs seek certification of the Reported Deceased Monetary Damages Class under Rule 23(b)(3).

577 U.S. 442, 453 (2016). Here, because TransUnion's automated DMF Matching Procedure was applied uniformly to each class member, the four core elements of each Class Member's claim—including willfulness and the proper measure of class-wide statutory and (where applicable) punitive damages—would be resolved on a class-wide basis. *See, e.g.*, *Brooks*, 743 F. Supp. 3d at 647.

Rule 23(b)(3)'s superiority requirement is also met. *See* Fed. R. Civ. P. 23(b)(3)(A)-(D). Most Settlement Class Members would have no practical incentive to bring individual FCRA suits against TransUnion in light of the limited recoveries available under 15 U.S.C. § 1681n(a). *See Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." (quotations and citation omitted)). Class treatment also avoids the inefficiency of "scattered individual lawsuits across the country, which will inevitably fail to address the entire claims of the entire class." *Brooks*, 743 F. Supp. 3d at 651.

#### 2. *TransUnion Acted on Grounds that Apply Generally to the Injunctive Relief Settlement Class [Rule 23(b)(2)]*

Finally, the Settlement Classes meet the requirements of Rule 23(b)(2) because the Injunctive Relief Settlement Class seeks only declaratory and injunctive relief on grounds that apply generally to the Class. TransUnion's DMF Matching Procedure was automated and uniformly applied across its business; that Procedure is subject to the injunctive relief outlined in the Settlement Agreement. The benefits of the injunctive relief will thus apply to each Injunctive Relief Settlement Class Member uniformly and apply to the class as a whole.

### C. The Settlement Satisfies the Requirements of Rule 23(e)(2)

Rule 23(e) requires the parties to seek court approval before settling a class-action lawsuit. Fed. R. Civ. P. 23(e). In "fulfilling [its] role as the [class's] fiduciary," the court must conclude

that the Settlement is "fair, reasonable, and adequate." *Prudential*, 148 F.3d at 299; *see also GM Trucks*, 55 F.3d at 785, 793–94 (preliminary approval requires initial focus on whether the "settlement is fair, reasonable and adequate" based on the record before the Court). Rule 23(e)(2) requires the court to consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorneys' fees, including timing of payments; and (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Each of these factors is satisfied here.

*i. Plaintiffs and Class Counsel Have Adequately Represented the Classes.*

Rule 23(e)(2)(A) asks "whether the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). This assessment is "redundant of the requirements of Rule 23(a)(4) and Rule 23(g)" and requires the court to determine "(1) whether the named plaintiff has interests common with, and not antagonistic to, the Class' interests; and (2) whether the plaintiff's attorney is qualified, experienced and generally able to conduct the litigation." *Cmty. Bank*, 795 F.3d at 393; *Prudential*, 148 F.3d at 311 (discussing Rule 23(g)). Here, both prongs are satisfied, for the reasons stated above.

In addition, the named Plaintiffs' interests are completely aligned with those of the absent Settlement Class Members: both groups were subjected to the same automated procedure that produced false deceased reports, and both groups stand to receive the same statutory and injunctive relief. Plaintiffs have also actively participated in the litigation, including sitting for their depositions and producing documents, and settlement discussions to achieve this result. Drake

Decl. ¶ 8; Kelly Decl. ¶ 15.

Class Counsel's collective experience further demonstrates adequate representation. Berger Montague and Kelly Guzzo have decades of specialized experience in FCRA and other consumer class action litigation. *See* Drake Decl. ¶¶ 10–11 & Exhibit 3; Kelly Decl. ¶¶ 8–9. Based on their extensive experience, both firms believe that this settlement is fair and reasonable and the result of extensive litigation and settlement negotiations. *See id.* Courts recognize that the opinions of experienced class counsel in favor of a settlement "should be afforded substantial consideration." *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 665 (E.D. Va. 2001).

*ii. Negotiations Were at Arm's Length and Involved Respected Mediators.*

Rule 23(e)(2)(B)'s second factor looks to whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B); *see also Flint Water Cases*, 571 F. Supp. 3d 746, 780 (E.D. Mich. 2021) (explaining that the second factor requires courts to "consider whether the negotiations were conducted at arm's length with no evidence of collusion or fraud"). "Courts presume the absence of fraud or collusion unless there is evidence to the contrary." *Flint Water Case*, 571 F. Supp. 3d at 780 (quoting *UAW v. Gen. Motors, Corp.*, 2006 WL 891151, at *21 (E.D. Mich. Mar. 31, 2006)). Here, no evidence suggests the presence of collusion or fraud between the parties.

Indeed, the presence of a respected independent mediator is one of the strongest indicators that negotiations were conducted at arm's length. *See* 5 CONTE & NEWBERG, NEWBERG ON CLASS ACTIONS § 13:48 (5th ed. 2025 update) ("There appears to be no better evidence of [a truly adversarial bargaining process] than the presence of a third-party mediator."). Here, after protracted litigation, the parties participated in multiple, days-long mediation sessions before the Honorable Douglas E. Arpert (Ret.), a former federal magistrate judge. And years before that, the parties unsuccessfully attempted to settle the case with Rodney A. Max, Esq., a private mediator

with a national reputation in complex class-action litigation. (Settlement Agreement § 1.3.; Drake Decl. ¶ 6). The active involvement of Judge Arpert, as well as the parties' prior unsuccessful efforts before Mr. Max, confirm the absence of collusion.

*iii. The Relief Provided to the Classes Is Adequate.*

Rule 23(e)(2)(C) requires the Court to consider the adequacy of the settlement relief in light of (i) the costs, risks and delay of trial and appeal; (ii) the effectiveness of the proposed method for distributing relief; (iii) the terms of any proposed award of attorneys' fees; and (iv) any agreement required to be identified under Rule 23(e)(3).

First, the costs, risks, and delay of trial and appeal strongly support approval. *See* Fed. R. Civ. P. 23(e)(2)(C)(i). Although Class Counsel believe in the strength of Plaintiffs' claims in this Action, they recognize that any FCRA suit against TransUnion involves substantial risk, including the risk that TransUnion's experts would persuade the trier of fact that the allegedly erroneous deceased reporting was reasonable or non-willful. Continued litigation would also require this Court and the parties to litigate a contested motion for summary judgment and a complex trial, with significant exposure to appellate review. *See GM Trucks*, 55 F.3d at 785 (noting substantial delay and uncertainty inherent in further litigation).

Second, the proposed method of distributing relief is highly effective. All Autopay Category Members will receive an automatic payment without the need to submit a claim form; Claims-Made Category Members need only complete and submit a short Claim Form, with their unique Claim ID already pre-populated by the Settlement Administrator. (Settlement Agreement § 8.2(c); *see also id.* § 5.4(d).) And all Damages Class Members will have the opportunity to receive additional payments pre-established payment amounts based on the type of credit denial they received, with a cap of $10,000, based on the completion of a simple claim form and the submission of simple documentation. *Id.* Class members will thus be treated equitably relative to

the damages suffered, with no preference given to a class member other than to account for the difference between a publication that resulted in no denial, as opposed to one with serious consequences like denial of a car or mortgage loan. This use of "objective criteria to determine settlement distribution" is "a hallmark of fairness." *In re Flint Water Cases*, 571 F. Supp. 3d at 781.

Third, counsel's anticipated attorneys' fee request is reasonable. *See* Fed. R. Civ. P. 23(e)(2)(C)(iii). Class Counsel intends to seek a fee of up to 39.9% of the maximum value of the Common Fund ($9,981,000), plus out-of-pocket expenses capped at $625,000 and administration costs capped at $905,000. (Settlement Agreement § 6.3.). Although this is higher than the amount typically awarded when counsel seeks a percentage of a common fund, the Third Circuit has made clear that, in settlements with significant injunctive components, the Court should consider the value of the injunctive relief when setting fees. *See, e.g.*, *In re Wawa, Inc. Data Sec. Litig.*, 141 F.4th 456, 475 (3d Cir. 2025) ("Injunctive relief has real value and can be used in determining a reasonable attorney's fee award."); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 (3d Cir. 2011) (explaining that "the injunctive relief offered by the settlement" should not be wholly disregarded as it "[was] intended to benefit all class members regardless of individual monetary recovery"); *see also Kelly v. Bus. Info. Group, Inc.*, No. 15-cv-6668, 2019 WL 414915, *19 (E.D. Pa. Feb. 1, 2019) (in FCRA case, change in CRA's practices was a benefit to the class that weighed in favor of requested fee).

Here, there is no question that this class action was the reason for the change in TransUnion's policies—indeed, TransUnion has admitted that this lawsuit was the catalyst for change during the litigation. *See* ECF No. 91-4 (Kubes Report) at 28. And the injunctive relief addresses a significant problem. Absent this lawsuit, had TransUnion persisted with its prior

policy, hundreds of thousands of individuals would have been mislabeled as deceased. This relief carries real value to class members, as being wrongly labeled as deceased often results in an immediate credit denial. In support of their motion for attorney's fees, class counsel will have an expert opine on the value of the relief, which will likely exceed $10 million. A valuation at this level is also supported based on the value of this settlement alone—that is, this settlement puts a monetary value on the harm caused by erroneous deceased reporting that occurred in the past, and there should be and is a similar monetary value in injunctive relief that prevents erroneous deceased reporting in the future. This Court can and should account for that value when awarding fees in this matter. *See Wawa*, 141 F.4th at 475.

The Court need not consider the details of the anticipated fee request now. The question for now is simply whether the requested fee presents an "obvious deficiency" which would bar preliminary approval." *Santiago v. Am. Textile Co., Inc.*, 2025 WL 4741672, at *4 (W.D. Pa. Oct. 30, 2025) (cleaned up). It does not. And any portion of the requested fees, costs, or Service Awards that the Court does not approve will not be retained by TransUnion; instead, "any difference in such amounts shall remain in the Common Fund and be distributed as Pro Rata Payments." (Settlement § 6.3.) This structure ensures that even if the Court does not fully approve the requested fee, the settlement itself can and should still move forward.

Fourth, no other agreement is required to be identified under Rule 23(e)(3), and the Settlement Agreement will be filed concurrently with the motion for preliminary approval and posted on the Settlement Website, ensuring that any agreement identified by Rule 23(e)(3) is before the Court and the Class. *See* MANUAL FOR COMPLEX LITIGATION § 21.642 (4th ed.).

*iv. The Settlement Treats Settlement Class Members Equitably Relative to Each Other.*

Rule 23(e)(2)(D) requires that "the proposal treat[] class members equitably relative to

each other." Fed. R. Civ. P. 23(e)(2)(D). When considering this factor, a court "must balance the claims of those with potentially substantial damages with those with potentially minimal or insignificant damages." *Swinton v. SquareTrade, Inc.*, 454 F. Supp. 3d 848, 876 (S.D. Iowa 2020).

The proposal here treats Settlement Class Members equitably. Every Autopay Category Member receives $141 automatically, in recognition of the fact that they satisfy certain factors that have already caused them harm. Each Claims-Made Category Member is also entitled to the same $141 *pro rata* payment upon the timely submission of a Claim Form. And every Deceased Reporting Damages Class Member is entitled to the same payout depending on the type of injury or injuries (i.e., credit denial) suffered: $5,000 (mortgage denial), $1,500 (auto loan denial), and $1,000 (line of credit, personal loan, or credit card denial), subject to a per-Consumer cap of $10,000. (Settlement Agreement §§ 5.1-5.3.)

Members of the Injunctive Relief Settlement Class are also equally, and without any proof of damages, afforded the benefit of an unprecedented five-year commitment by TransUnion to maintain its materially enhanced DMF matching procedures that will avoid further harm to those class members. Accordingly, no Class Member is denied the basic benefits made available to every other Class Member in the same position and with the same relative damages, and each form of relief is rationally related to the distinct harms suffered by each class member category.

**D. The Proposed Notice and Notice Plan Satisfy Rule 23**

Because the Injunctive Relief Settlement Class is certified under Rule 23(b)(2) for declaratory and injunctive relief, Rule 23(c)(2)(A)'s individual notice-and-opt-out procedures do not apply to it. *See* Fed. R. Civ. P. 23(c)(2)(A); *see also Smith v. Bayer Corp.*, 564 U.S. 299, 315 (2011). The Settlement nonetheless affords the Injunctive Relief Class notice through the Settlement Website and the CAFA notice to the relevant government authorities required by Rule 23(e)(2), which constitutes the only notice for which Rule 23(b)(2) calls.

The proposed Class Notices, attached as Exhibits B.1 (Postcard), B.2 (Long-Form Website Notice), B.3 (Email Notice), B.4 (Reminder Postcard), and B.5 (Reminder Email) to the Settlement Agreement, satisfy the requirements of Rule 23. The Notices identify the Settlement Administrator's and Class Counsel's contact information; the date, time, and place of the Final Fairness Hearing; the precise opt-out requirements; the precise procedure for objecting under Rule 23(e)(5); the precise consequences of failing to opt-out or object; and the maximum attorneys' fees request, expenses award, and Service Awards. *See id.*

The proposed notice program also provides individual direct notice via U.S. Mail (postage prepaid with change-of-address service), email, the Settlement Website, and a 45-day reminder email to class members who have not yet submitted a Claim Form. (Agreement §§ 8.2.) If the mailed Notice is returned as undeliverable, the Settlement Administrator will first re-mail the Notice if it receives an address-change notification from the U.S. Postal Service, and, if not, may attempt to obtain an updated address using skip-tracing methods. (*Id.*) The Notice Plan also includes a Settlement Website that will host all of the principal settlement documents. (*Id.*)

Accordingly, the proposed Notices and Notice Plan, taken together, represent "the best notice that is practicable under the circumstances," and the Court should approve them. *See* MANUAL FOR COMPLEX LITIGATION § 21.311 (mail notice is the ideal method of informing class members of a class settlement where members can be identified, while website notice is a supplemental means of providing notice).

**CONCLUSION**

The proposed class-action settlement is an excellent result considering the circumstances of the litigation, the extent of discovery that the parties conducted, the use of experts on both sides, the demonstrated willingness of TransUnion to defend its procedures vigorously, and the substantial monetary and injunctive relief that the Settlement now affords the Settlement Classes.

The terms of the proposed class-action settlement, the circumstances of the parties' negotiations, and the elimination of further costs and delay associated with litigating this Action through trial and appeal all satisfy the standards for preliminary approval.

For these reasons, Plaintiffs respectfully request that the Court enter the [Proposed] Order Preliminarily Approving Class Action Settlement, which: (1) grants preliminary approval to the proposed settlement; (2) certifies the Reported Deceased Monetary Damages Class under Rule 23(b)(3) and the Injunctive Relief Settlement Class under Rule 23(b)(2); (3) approves the form of the proposed Class Notices filed as Exhibits B.1, B.2, B.3, B.4, and B.5 to the Settlement Agreement and the Notice Plan described in Section 8.2 of the Settlement Agreement; (4) orders the Settlement Administrator to mail the Notice in accordance with the Notice Plan; (5) approves the appointment of Angeion Group, LLC, as Settlement Administrator, Plaintiffs as Class Representatives, and Plaintiffs' counsel as Class Counsel; and (6) sets the date of the Final Fairness Hearing at the Court's earliest availability, but no sooner than ninety (90) days from the date of the mailing of Notice to the Settlement Classes.

Dated: August 14, 2026

Respectfully submitted,

**BERGER MONTAGUE PC**

By: *_/s/ E. Michelle Drake_*
Shanon J. Carson (Pa. I.D. No. 85957)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: 215-875-4656
scarson@bergermontague.com

-and-

E. Michelle Drake (*pro hac* vice)
Joseph C. Hashmall (*pro hac vice*)
1229 Tyler Street NE, Suite 205

Minneapolis, MN 55413
Tel.: 612-594-5999
emdrake@bergermontague.com
jhashmall@bergermontague.com

-and-

Zachary M. Vaughan (*pro hac vice*)
1001 G Street NW, Suite 400 East
Washington, DC 20001
Tel: 215-875-4602
zvaughan@bergermontague.com

**KELLY GUZZO, PLC**
Kristi C. Kelly (*pro hac vice*)
Andrew J. Guzzo (*pro hac vice*)
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Tel.: 703-424-7572
kkelly@kellyguzzo.com
aguzzo@kellyguzzo.com

*Counsel for Plaintiffs*